TECOM, INC, Plaintiff,

v.

The UNITED STATES, Defendant,

No. 00–475C.

United States Court of Federal Claims.

June 27, 2005.

Karl J. Nelson, Saul Ewing LLP, Baltimore, Maryland, for plaintiff.

Michael Austin, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, all of Washington, D.C., for defendant. John T. Lauro, Air Force Legal Services Agency, Department of the Air Force, Arlington, Virginia, of Counsel.

## OPINION AND ORDER

WOLSKI, Judge.

This case concerns the respective responsibilities of a government contractor and the United States Department of the Air Force ("Air Force") under a contract to service and maintain vehicles at an Air Force Base (AFB) complex. The contractor, suing on behalf of a former subcontractor, argues that the Air Force breached a term of the contract requiring additional compensation for performing work deferred ·by the out-going contractor; that the extent of this deferred work constitutes a constructive change to the contract; that the Air Force breached im-

plied duties to cooperate and not to hinder performance; and that the subcontractor was wrongfully terminated by the Air Force. The contractor has moved for partial summary judgment on its three breach claims, and the Air Force has cross-moved for summary judgment on all claims. For the reasons that follow, the Court grants summary judgment in favor of the contractor on the Air Force's liability for breach of contract, grants summary judgment in favor of the Air Force on the wrongful termination claim, and denies the motions in all other respects.

## I. BACKGROUND

### A. Tecom's Contract with the Air Force

On October 21, 1996, plaintiff Tecom, Inc. was awarded contract number F05604–97–C–9001 ("the Contract"), to provide, among other things, vehicle maintenance services at Peterson AFB, Colorado, and satellite sites.[1] Pl.'s Resp. Def.'s Proposed Findings ¶ 1; Contract, Pl.'s Ex. 1 at 2, ¶ 1. Under the Contract, the out-going contractor, LB & B Associates, Inc. ("LB & B"), was to perform the maintenance duties during the phase-in month of November, 1996, as Tecom and its staff became familiar with these tasks. Contract, Pl.'s Ex. 1 at 2, ¶ 1; id. at 44–45. Tecom took over the maintenance responsibilities on December 1, 1996, for a term that would run through September 30, 1997, and could be renewed, at the Air Force's option, for five additional one-year terms. See Contract, Section F, Pl.'s Ex. 1 at 19.

The vehicle maintenance portion of the Contract is at issue in this case. Under this "firm fixed price" contract, Tecom was to receive $76,282 per month during an initial, ten-month term, for maintaining a base fleet of 563 vehicles. Contract, Pl.'s Ex. 1 at 3, ¶ 7AA; Technical Ex. ("TE") 5e to Performance Work Statement ("PWS"),[2] Pl.'s Ex. 5 at 155–95; Def.'s Resp. Pl.'s Proposed Findings ¶ 18. Because the bulk of this fleet consisted of vehicles that are more complex to maintain than the typical car—such as dump trucks, ambulances, fire trucks, snow plows, pick-ups, vans, and the like—the measure of "vehicle equivalents" was employed to more accurately express the work burden. See PWS Section C–2, ¶ 2.2.54, Pl.'s Ex. 5 at 20. The base fleet totaled 1414 vehicle equivalents. TE 2b–1 to PWS, Pl.'s Ex. 5 at 80–82; TE 5e to PWS, Pl.'s Ex. 5 at 195.

The contractor was tasked to "provide maintenance capability sufficient to ensure" that two separate standards were met. PWS ¶ 5, Pl.'s Ex. 5 at 28. For each category of vehicle, the percentage of vehicles that were out-of-commission at any one time could not exceed the vehicle out-of-commission ("VOC") rate established for that category. See id.; PWS ¶ 5.2.2.1, Pl.'s Ex. 5 at 37; TE 1–7-TE 1–10 to PWS, Pl.'s Ex. 5 at 71–74. For each type of vehicle, a certain number had to be in working order at all times, meeting the Minimum Essential Levels ("MELs"). PWS ¶ 5, Pl.'s Ex. 5 at 28; PWS ¶ 5.2.2.1, id. at 37; TE 9 to PWS, id. at 216–25. The Contract specified that "[t]he contractor shall work other than normal duty hours or be required to rent/lease vehicles at no additional cost to the Government to ensure VOC rates and MELs are met." PWS ¶ 5, Pl.'s Ex. 5 at 28. The contractor was required to "provide vehicle maintenance on a 24 hour basis when required to maintain no more than 10 percent of the total fleet vehicle out of commission (VOC) rates, and meet the MEL." PWS ¶ 5.2.1, Pl.'s Ex. 5 at 36.[3]

---

1. The Peterson AFB Complex also included Cheyenne Mountain Air Station (AS) and Falcon AFB.

2. The "Performance Work Statement for Vehicle Operations and Maintenance Services for Peterson Air Force Base Complex Colorado" (also called the "Transportation PWS"), dated April 8, 1996, was an attachment to Section J of the Contract and was incorporated by reference into the Contract. See, e.g., Contract, Pl.'s Ex. 1 at 3, ¶ 7; id. at 16, ¶ 2. A revised version of the Transportation PWS, apparently updated on December 3, 1996, to reflect, among other things, an increase in the base fleet's vehicle equivalents, was submitted by Tecom as its Exhibit 5 (to see the revisions, compare Pl.'s Ex. 1 at 78, 83, 125, 165–203, 216 and 237 with Pl.'s Ex. 5 at 33, 38, 80–83, 157–95, 208 and 230). It is undisputed that this version of the Transportation PWS applies in this case. See, e.g., Def.'s Resp. Pl.'s Proposed Findings ¶ 9.

3. LB & B had been under the same obligations in its expiring contract with the Air Force. See Pl.'s Ex. 12 at 25, 36.

This lawsuit revolves primarily around a few provisions of the Contract. The most important paragraph was the following, from the Transportation PWS:

> *Delayed/Deferred Maintenance at Start of Contract:* On the contract start date, the required maintenance actions will not exceed 25 labor hours per 100 vehicle equivalents and there will not be any overdue scheduled/preventive maintenance and special inspections/test. If either of these standards are exceeded, the incoming contractor shall reduce this backlog and will be compensated for this initial reduction IAW the over and above hourly rate and material costs as verified by invoices input into the OLVIMS. The contractor shall have thirty (30) days to meet the performance requirements for these services. This compensation does not apply to the incumbent contractor.

PWS ¶ 5.5.1, Pl.'s Ex. 5 at 43.[4]

The "OLVIMS" referenced by this provision was the Air Force's On-line Vehicle Interactive Management System,[5] a computer system used by the base to keep records, files, and reports on vehicle operations and maintenance. PWS ¶ 2.2.28, Pl.'s Ex. 5 at 18. The Contract specified that the contractor "shall utilize the most up-to-date version of [OLVIMS] to collect, accumulate, and maintain monthly maintenance data ... [,] shall use and accurately maintain OLVIMS man-hour accounting system," and "shall verify the accuracy of data input and make corrections and install new program updates prior to any product distribution." PWS ¶ 5.2.3.1, Pl.'s Ex. 5 at 40. It also specified that the "contractor shall document all repair actions required on a work order," PWS ¶ 5.2.2.5, Pl.'s Ex. 5 at 38, and this was among the information required to be entered into OLVIMS. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 12, 14–15.

The parties are in agreement that, given the total vehicle equivalents for the base

fleet, "25 labor hours per 100 vehicle equivalents" translates into 355 labor hours. *See* Def.'s Resp. Pl.'s Proposed Findings ¶ 17. Thus, Tecom was to be specially compensated if more than 355 labor hours were needed to "reduce th[e] backlog" of "required maintenance actions" as of the Contract start date. This required maintenance is called "Delayed/Deferred Maintenance" in the subject line of the provision. The Contract in turn defines "Delayed/Deferred Maintenance" as "[m]aintenance that can be delayed/deferred without damage to vehicle/equipment or compromise of safety standards or prevents the vehicle/equipment from being used for its designed function." PWS ¶ 2.2.15, Pl.'s Ex. 5 at 17.

The parties focus on one additional provision in the Contract, detailing action that was to be taken by Tecom, LB & B, and the Air Force's Functional Area Chief ("FAC"). *See* PWS ¶ 2.1.13, Pl.'s Ex. 5 at 14 (defining FAC). This provision, entitled *"Vehicle Assessment,"* stated: "At contract termination, the incumbent contractor, incoming contractor, and FAC shall jointly assess all vehicles to be transferred to the new contract or Government for quantity, condition, and maintenance status." PWS ¶ 5.5.2, Pl.'s Ex. 5 at 43.[6]

### B. Tecom's Amended Complaint

Tecom filed a First Amended Complaint ("Complaint") on January 30, 2003. According to the allegations in the Complaint, the Air Force breached its obligations under the Contract in a variety of ways: by turning over to Tecom Government–Furnished Property ("GFP")—namely, the fleet of vehicles—that was not in the condition the Contract warranted; by not compensating Tecom for the extra work and expenses required to restore the fleet to the proper condition; by preventing Tecom from discerning and recording the extent to which the fleet was sub-standard and required maintenance; and

---

4. For the uninitiated, the acronym "IAW" found in the quoted provision and elsewhere in the Contract stands for "in accordance with."

5. It is also identified as the "On–Line–Vehicle–Integrated Management System." PWS ¶ 5.2.3.1, Pl.'s Ex. 5 at 40.

6. LB & B had an identical provision in its contract with the Air Force. *See* Pl.'s Ex. 12 at 45, PWS ¶ 5.5.2.

by retaliating against Tecom's subcontractor in response to the latter's efforts to secure reimbursement for the extra work needed to restore the fleet to its proper condition.

Tecom's subcontractor for the vehicle operations and maintenance services portion of the Contract was the Baltimore, Maryland-based company Fleetpro, Inc. According to the Complaint,[7] during the phase-in month of November, 1996, Fleetpro attempted to determine the condition of the Peterson AFB fleet. Fleetpro started with a random inspection of six vehicles, which revealed "numerous safety defects and maintenance defects that would lead to further damage ... indicat[ing] substantial non-compliance with Air Force standards and requirements." Complaint ¶ 11. These results were presented to the Air Force, which called together a "technical team" that was "directed ... along with incumbent personnel and Tecom/Fleetpro" to jointly inspect the vehicle fleet. *Id.* The inspection of an additional 65 vehicles confirmed the existence of a large number of safety and other deficiencies requiring maintenance, deficiencies that were not reflected in the Air Force's records at that time. *Id.* ¶ 12. These 71 vehicles were jointly re-inspected at the request of executives from incumbent contractor LB & B, and their poor condition was confirmed. Additional vehicles were inspected with similar results, and all told 213 of the fleet's 563 vehicles were inspected. *Id.* ¶ 13.[8] Based on these November inspections, it was estimated that some 65% of the vehicle fleet should have been "immediately ordered out of service due to safety defects alone." The Air Force instead ordered the inspections to cease. *Id.*

Fleetpro determined that "more than 3,700 hours of maintenance were required" for just the sample of vehicles inspected, and that extrapolated over the entire fleet, "between 7,500 and 10,000 hours of maintenance" were required for the fleet to meet "the Air Force's minimum serviceability standards." Complaint ¶ 16. The Air Force recognized

the poor condition of the fleet upon contract turn-over, and waived some of the Contract requirements while Fleetpro worked to restore the fleet to the proper condition. *Id.* ¶ 19. The Air Force directed Tecom and Fleetpro to repair safety defects, but to release into service vehicles requiring the repair of non-safety defects. *Id.* ¶ 20. After Tecom reported in mid-December, 1996, that more than six months and $676,000 would be needed to bring the fleet's condition up to the minimum required standards, the Air Force issued a change order funding $52,414 worth of extra work to be performed over a two-week period. *Id.* ¶ 22. This appeared to be the balance of discretionary funds available to the Air Force for such purposes. *Id.*

Fleetpro entered data on the 213 inspected vehicles into the OLVIMS database, recording the various maintenance defects identified. These required repairs were given an "L code" in the system "to indicate maintenance delayed due to lack of funds." Complaint ¶ 23. As additional defects in the fleet were discovered, this information was added to OLVIMS. In January, 1997, the Air Force directed Tecom and Fleetpro to delete from OLVIMS all of the required repairs that had been given the L code designation. Fleetpro initially resisted this order as being contrary to Air Force regulations, specifically mandated by the Contract, concerning the maintenance of accurate property records. In response, the Contracting Officer apparently told Tecom that if Fleetpro did not cease complaining about the condition of the vehicle fleet, the Air Force would "write [Contract Discrepancy Reports] to kill Fleetpro." *Id.* ¶ 25. Fleetpro was also ordered not to comply with the Contract requirement that monthly OLVIMS reports be produced. The OLVIMS data purge removed from the records the results of the vehicle inspections that had already been performed, necessitating that these vehicles be inspected again when brought into the shop on the regular

---

7.   The factual allegations detailed below are summarized in this subsection of the opinion for the purpose of providing a background; whether and to what extent they are disputed will be considered in later portions of this opinion.

8.   A document signed by the Air Force's Contracting Officer for the LB & B contract, who was also serving in the same capacity at the time for the Tecom contract, indicates that 236 vehicles had been inspected through November 26, 1996. Pl.'s Ex. 19 (CDR number 002).

schedule. Deficiencies that had already been identified worsened and caused additional damage to the vehicles in the interim. Complaint ¶ 27.

In January, 1997, Fleetpro developed its own computer program to keep track of the vehicle maintenance required and performed under the Contract. After initially being authorized to implement the program, Fleetpro was directed by the Air Force to shut it down in April, 1997, eliminating another source of data concerning the condition of the fleet and the costs expended to restore the fleet to the required standards. Complaint ¶ 28.

Fleetpro contends that the Air Force unjustly issued Contract Discrepancy Reports ("CDRs") despite the Air Force's waiver of certain Contract requirements due to the inherited condition of the vehicle fleet. Complaint ¶ 29. These CDRs were based on the alleged over-inspection of Fleetpro's work by Quality Assurance Evaluators ("QAEs") and were purportedly for the improper purposes of "threaten[ing], intimidat[ing], and caus[ing] financial harm" to Fleetpro. *Id.* Although Fleetpro was able to bring the previously sub-standard fleet up to "required standards of safety and serviceability by the end of May 1997," the Air Force allegedly pressured Tecom to terminate the subcontractor. *Id.* ¶ 30. In addition to threats to terminate Tecom for default based on Fleetpro's performance, Tecom contends that the Air Force directed it "to cancel the subcontract with Fleetpro." *Id.* ¶¶ 32–33. On June 2, 1997, Tecom terminated the subcontract with Fleetpro. *Id.* ¶ 7.

Tecom brought five separate causes of action against the Air Force. The first claim is for an equitable adjustment, on the grounds that the poor condition of the vehicle fleet, and delay disruption caused by the Air Force, resulted in constructive changes to the Contract. Tecom argues that additional work and costs were entailed in performing what amounted to a complete restoration of the fleet to meet the proper standards, which differs greatly from what would have been needed to perform normal maintenance of the fleet. *See* Complaint ¶¶ 34–37. The second claim is for breach of contract, based on allegations that the Air Force did not pay additional compensation for an excess backlog of required maintenance, turned over a fleet of vehicles that failed to meet the Contract requirements, and contributed to vehicle abuse during the Contract's term. *See id.* ¶¶ 38–39. The third claim is for breach of an implied duty of cooperation, on the basis that the Air Force ordered that vehicle inspections cease, that repairs be delayed, and that vehicle maintenance and defects information be deleted from computer databases; and that the Air Force improperly manipulated the CDR process. *See id.* ¶¶ 40–42. The fourth claim is for breach of an implied duty not to hinder or interfere with contract performance. This claim rests on, among other things, the allegations that the Air Force over-inspected Fleetpro's work, "prohibit[ed] Fleetpro from obtaining customer feedback on services rendered," and directed Fleetpro to stop keeping records that would demonstrate the amount of work required to restore the fleet to the proper condition. *See id.* ¶¶ 43–45. The fifth cause of action is for wrongful termination for default, alleging that the Air Force improperly pressured Tecom to terminate Fleetpro. *Id.* ¶¶ 46–47.

## C. The Motions for Summary Judgment

Tecom has moved for partial summary judgment, on its second, third, and fourth causes of action. It argues that the Air Force breached paragraph 5.5.1 of the Transportation PWS, in failing to compensate it, at the over and above hourly rate plus payment for material costs, for reducing the excess maintenance backlog inherited at the Contract turn-over. It also argues that the various actions of the Air Force breached an implied duty to cooperate and an implied duty not to hinder performance. Tecom further seeks a determination that an audit of its damages calculations performed by the Defense Contract Audit Agency precludes any dispute as to the facts supporting these damages.

The Air Force has cross-moved, seeking the grant of summary judgment on all five of Tecom's causes of action. It argues that there was no excess backlog of maintenance work to be specially compensated under the

Contract; that it fulfilled all duties, implied or express, that it owed Tecom; that Tecom and Fleetpro performed no work beyond what the Contract required; and that it was not responsible for the termination of Fleetpro.

## II. DISCUSSION

### A. Applicable Legal Standards

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Although the Court is considering motions for summary judgment from both parties, it does not follow that one or the other must prevail at this stage of the litigation. The Federal Circuit has explained:

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987) (citations omitted).

Material facts are those "that might affect the outcome of the suit under the governing law." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. The moving party, however, must file with the Court the documentary evidence, such as exhibits, that support its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548; *see also Anchor Savings Bank, FSB v. United States,* 59 Fed.Cl. 126, 140 (2003).

Contract interpretation is a question of law. *Calif. Fed. Bank v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001); *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir.1993); *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1292 (Fed.Cir. 2002). Therefore, it is a proper subject for a motion for summary judgment. A contract's terms may, however, be ambiguous, necessitating a review of extrinsic evidence to determine the parties' intent. Under such circumstances, if material facts are genuinely in dispute, summary judgment may not be granted. *See Beta Systems Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) (reversing a grant of summary judgment in view of extrinsic evidence of intent, which raised a question of material fact regarding contract interpretation); *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988) ("there may be fact questions to resolve in instances of ambiguous contracts"); *McGrew Bros. Sawmill, Inc. v. United States,* 224 Ct.Cl. 740, 743, 1980 WL 13236 (1980) (trial required because "the parties dispute most of the extrinsic facts"); 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.12, at 307 n. 5 (3d ed.2004).

### B. Key Facts That Are Not in Dispute

A review of the parties' submissions reveals that there are numerous material facts that are not genuinely disputed. This is somewhat obscured by the parties' disagreements over whether the inspections of the fleet performed jointly by Fleetpro, LB & B,

and the Air Force qualify as the joint "assessment" required by each contract, and whether the needed repairs identified by these inspections could be considered part of the "required" maintenance "backlog" that is specially compensable under the Contract. But these inspections did occur and did reveal that a large portion of the fleet required maintenance as of the December 1, 1996 turn-over of responsibilities to Tecom and Fleetpro. *See* Def.'s Resp. Pl.'s Proposed Findings ¶¶ 41, 46–47, 49–53, 62, 63, 65.

During the transition month, on or about November 11, 1996, Fleetpro inspected six vehicles from the fleet. Pl.'s Ex. 10 at 11 (Def.'s Resp. to Req. Adm. ¶ 11). From November 13 to 16, an additional 65 vehicles were randomly inspected. These inspections were performed jointly by personnel from Fleetpro, LB & B, and the Air Force. Pl.'s Ex. 10 at 18 (Def.'s Resp. to Req. Adm. ¶ 18).[9] These inspections also revealed a large number of repairs that were needed, including repairs of safety defects. Major Mark Karzon, the Air Force's Functional Area Chief ("FAC") responsible for maintenance at the AFB complex, approved Fleetpro's request that work orders be entered into OLVIMS to reflect the discrepancies identified in these inspections. *See* Pl.'s Ex. 14 (Minutes of November 29, 1996 meeting taken by Contracting Officer Paul E. Banis Jr.). The outgoing contractor, LB & B, asked that the 71 vehicles be reinspected in the presence of officials from the company, and the poor condition of this sample of the fleet was confirmed. *Id.* The Contracting Officer for the Air Force noted that "[i]t was determined that a good portion of the vehicles inspected had recently been in the shop for maintenance and returned to service with severe safety violations." *Id.* The general manager of LB & B agreed with the results of these inspections, admitting that a number of needed repairs and severe safety defects were uncovered. *Id.; see also* Pl.'s Ex. 9 (Banis depo. tr. pp. 58–59); Def.'s Resp. Pl.'s Proposed Findings ¶ 50. Joint inspections continued, until 236 vehicles had been inspected through November 26, 1996. *See* Pl.'s Ex. 19; Def.'s Resp. Pl.'s Proposed Findings ¶ 86.

A brief explanation of the identities and roles of some of the Air Force employees involved in this case would aid the appreciation of some of the undisputed facts. Major Karzon was the FAC. Def.'s Resp. Pl.'s Proposed Findings ¶ 32. Under the Contract, this position is described as the head "of any functional area where contract services manpower is used for some or all of the workload" and as "the government person with overall responsibility for providing the services." PWS ¶ 2.1.13, Pl.'s Ex. 5 at 14. As noted above, the FAC was designated in the Contract as the Air Force employee responsible for participating in the joint "vehicle assessment" at the termination of LB & B's contract. *See* PWS ¶ 5.5.2, Pl.'s Ex. 5 at 43; Pl.'s Ex. 12 at 45 (LB & B Contract PWS ¶ 5.5.2). The Contracting Officer for the Contract, Mr. Larry Ozburn, took leave of this position to work on the bid protest challenge to the award, and from roughly October 23, 1996 through December 24, 1996, these responsibilities were assumed by the Contracting Officer for the expiring LB & B contract, Master Sergeant Banis.[10] *See* Def.'s Resp. Pl.'s Proposed Findings ¶¶ 78, 82–83; Pl.'s Ex. 6 (Ozburn depo. tr. p. 63). Ms. Bonnie Pavlik headed the Air Force unit administering the Contract. Pl.'s Ex. 6 (Ozburn depo. tr. p. 25).

Memoranda issued by Karzon and Pavlik demonstrate that at the time the inspections were being performed, the responsible Air Force personnel believed that the November inspections constituted the "assessment" required by the LB & B contract, and that the needed repairs revealed by these inspections were part of the "backlog" that is specially compensable. Pl.'s Exs. 15–18. Major Karzon's November 19, 1996 memorandum to his unit, with the subject "Delayed/Deferred Maintenance on Contract Start Date," refer-

---

**9.** There is some dispute concerning the status of the LB & B project manager who participated in these inspections, as he had apparently already agreed to serve Fleetpro in that capacity. *See* Pl.'s Ex. 14.

**10.** Both Ozburn and Banis are identified in the Contract, the former as the Contracting Officer and the latter as the Contract Specialist. *See* Pl.'s Ex. 1 at 20.

enced the joint assessment responsibility, the 25 labor hours per 100 vehicle equivalents limit on "required maintenance actions," and the responsibility to document repair actions on work orders and input them into OL-VIMS. Pl.'s Ex. 15. The memorandum also requested that "the incumbent contract [sic] be advised of his responsibilities." *Id.* A "fax message" bearing that same date, addressed to LB & B, was signed by Pavlik, the head of the unit. Pl.'s Ex. 16. This message quoted from the LB & B contract provisions requiring the joint assessment, mandating documentation of required repairs on work orders, and requiring that maintenance data be input into OLVIMS. *Id.* The final sentence read, "You are to comply with the terms and conditions of the contract." *Id.*

A November 22, 1996 memorandum from Major Karzon to his unit bore the subject "Contractor Non-performance, LB & B Associates." Pl.'s Ex. 17. It began by referencing the LB & B Contract: "IAW PWS 5.5.2, the government preliminary assessment of 150 vehicles shows three significant findings." *Id.* Paragraph 5.5.2 of the PWS to LB & B's contract, it bears repeating, was the "vehicle assessment" provision that stated, "[a]t contract termination, the incumbent contractor, incoming contractor, and FAC shall jointly assess all vehicles to be transferred to the new contract or Government for quantity, condition, and maintenance status." Pl.'s Ex. 11 at G108970. The first "significant findin[g]" was that "the quality of maintenance is deficient by T.O. 36–1–23 standards," due to "the significant amount of *undocumented safety discrepancies found during the joint assessment.*" Pl.'s Ex. 17 (emphasis added).[11] The second was the Air Force's "estimate that the *delayed maintenance backlog* will exceed 25% of the total vehicle equivalents in OLVIM[S] by contract termination." *Id.* (emphasis added). Third, "[t]he projected number of *backlog hours* shows that the quality control program was substandard." *Id.* (emphasis added). The memorandum concluded:

We estimate the contract *backlog hours at new contract start* to be substantial. If LB & B Associates does not step up to their responsibilities in the PWS and reduce the backlog hours, we estimate the *cost to the government* to be unacceptable. We will forward actual backlog hours when they are compiled.

Pl.'s Ex. 17 (emphases added); *see also* Pl.'s Ex. 53 (Karzon depo. tr. p. 114).

Apparently in response to this memorandum, Pavlik signed a fax message to LB & B also dated November 22, 1996. Pl.'s Ex. 18. This message begins, "IAW PWS 5.5.2, the Government *preliminary assessment of 150 vehicles* shows three significant findings which are clearly in violation of the contract." *Id.* (emphasis added). Pavlik noted the "quality of maintenance is deficient" due to "the significant amount of undocumented safety discrepancies found during the joint assessment," and "estimated that the delayed maintenance backlog will exceed 25% of the total vehicles equivalents in OLVIM[S] by contract expiration." *Id.* Pavlik also echoed Karzon in noting "[t]he projected number of backlog hours shows that the quality control program was substandard," and warned LB & B: "If you do not reduce the delayed maintenance backlog to the standards of the PWS, the Government intends to file a claim and withhold an appropriate amount." *Id.*

On November 27, 1996, the acting Contracting Officer, Paul Banis, signed and transmitted to LB & B several CDRs—identified as being from Karzon, the FAC—which concerned the deficiencies revealed in these inspections. *See* Def.'s Resp. Pl.'s Proposed Findings ¶ 56; Pl.'s Ex. 19. Contract Discrepancy Report number 002 stated the problem as follows:

Based on *the vehicle assessment* that has been accomplished through 26 Nov 96 IAW *PWS paragraph C–5.5.2*, RS–20, Quality of maintenance is substandard to T.O. 36–1–23 as required by PWS paragraph C–5.2.2.1. This is based on total estimated backlog hours and the high num-

---

11. The PWS to the Contract, as well as the one to LB & B's contract, required the contractors to "maintain the vehicle fleet ... using standards established in T.O. 36–1–23." *See* Def.'s Resp.

Pl.'s Proposed Findings ¶¶ 11, 24; PWS ¶ 5.2.2.1, Pl.'s Ex. 5 at 37; ¶ 5.2.2.1, Pl.'s Ex. 12 at G108961.

ber of safety discrepancies identified. *Of the 236 vehicles inspected, we estimate 2500–3000 backlog maintenance hours over and above the PWS allowance.* Over 50% of these vehicles have open safety items. Most of these vehicles are still in operation. Request LB & B Associates immediately call in all vehicles with open safety items and correct immediately. In addition, action must be taken to perform maintenance IAW T.O. 36–1–23 and *reduce the maintenance backlog to 25% of the total vehicle equivalents.*

Pl.'s Ex. 19 (emphases added).

Contract Discrepancy Report number 003 addressed the following issues:

IAW PWS, paragraph C–5.2.1, the VOC is not acceptable as of COB 26 Nov 96. We do not anticipate acceptable VOC standards by month end without immediate action by LB & B Associates. The fleet VOC is 17% vs. 10% required; Group Code A is 19.2% vs. 7% required; Group Code C is 27.3% vs. 16% required; Group Code D is 11% vs. 10% required; Group Code P is 32% vs. 10% required; and Group Code F is 39% vs. 12% required.

*Id.* Contract Discrepancy Report number 004 identified the backlog problem:

IAW PWS RS–31, delayed maintenance backlog hours will exceed 25% of the total vehicle equivalents as of COB 26 Nov 96. Of the 236 vehicles inspected during the joint vehicle assessment we estimate between 2500–3000 backlog maintenance hours. *When the rest of the fleet is inspected, the backlog hours could exceed 6000.*

*Id.* (emphasis added). Two other CDRs concerned the determination that, "[b]ased on the joint vehicle assessment, over 50% of the inspected vehicles contained safety discrepancies." Pl.'s Ex. 19 (CDRs numbered 005 and 006). The Air Force called the inspections "assessments" in these CDRs, just as

the memoranda from Banis and Pavlik clearly referred to these inspections as assessments. The Air Force acknowledged that as many as 6,000 hours of backlog maintenance may have been required for the fleet, based on the results of the inspections.

During the transition month, LB & B was still the entity responsible for inputting data, such as needed work orders for repairs, into OLVIMS. *See* Pl.'s Ex. 1 at 45 (Attachment 6 to Contract) (phase-in plan provides that "[c]urrent contractors operate system during month of November 1996 ... and process November account transfer documentation"). Fleetpro asked LB & B to enter the results of these joint inspections, but the incumbent declined to do so and forbade Fleetpro from utilizing OLVIMS. Pl.'s Ex. 20; Pl.'s Ex. 21 (Albaugh depo. tr. pp. 180–83).[12]

The CDRs issued to LB & B by Banis were later withdrawn on December 11, 1996, after Tecom assumed the contractual responsibilities of maintaining the fleet. *See* Pl.'s Resp. Def.'s Proposed Findings ¶ 25.[13] That same day, Major Karzon wrote an internal Air Force memorandum that referenced "the issue of backlog maintenance hours found in the joint vehicle assessments." Def.'s Resp. Pl.'s Proposed Findings ¶ 97; Pl.'s Ex. 29. Another internal Air Force memorandum from Major Karzon's unit, dated December 16, 1996, referenced "the joint vehicle assessment at contract phase-in." Pl.'s Ex. 52. On December 18, 1996, Major Karzon wrote a memorandum in which he referred to the inspections of the fleet as an "assessment." Pl.'s Ex. 31. Under the Contract section governing payment for safety repairs, a modification was issued to pay Fleetpro for some of the repair work done on the inspected vehicles. Def.'s Resp. Pl.'s Proposed Findings ¶ 87–88. Tecom drafted a "get well program" that estimated how much time and resources would be needed to restore the fleet to compliance with the Contract stan-

---

**12.** The Air Force offered no evidence rebutting this, and merely points out Tecom's witness, Mr. Roger Albaugh, the LB & B project manager at the time the joint inspections commenced, had already been hired to be Tecom's project manager. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 71–73.

**13.** LB & B apparently was not informed at the time that the CDRs had been withdrawn, as it contacted the Air Force by telephone nearly one year later—on December 1, 1997—to inquire about the status of these CDRs. *See* Appendix to Def.'s Opp. at 75 (letter to LB & B from Air Force dated December 2, 1997).

dards. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 95–96. Tecom's estimate at that time was that six months and in excess of $676,000 in parts and labor were needed to eliminate the backlog. *Id.; see also* Pl.'s Ex. 28 ("Maintenance Backlog Reduction Costs").

After being informed of the cost of the plan to repair the fleet, Air Force personnel met on January 8, 1997, to discuss Tecom's request to be paid for making these repairs. The Air Force discussed using CDRs against Tecom in response: "If you have to ask for money for backlog, then we're going to have to start taking deductions from them." Def.'s Resp. Pl.'s Proposed Findings ¶ 110; Pl.'s Ex. 32 (notes from Jan. 8, 1997 meeting). *See also* Pl.'s Ex. 61 (Gilchrist depo. tr. p. 180) (testifying that Karzon threatened, "we could kill Fleetpro with CDRs").

The needed repairs identified by the inspections were entered into OLVIMS by Fleetpro. The Air Force directed that those not covered by the modification were to be given an "L code" indicating deferral due to lack of funds. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 91, 93; *see also* Pl.'s Ex. 25 (Dec. 6, 1996 Karzon memo.). These L-coded vehicles, which needed repairs that were apparently not safety-related, were ordered by the Air Force to "be placed into service and scheduled into the shop or repaired at the next scheduled maintenance interval." Pl.'s Ex. 25; *see also* Def.'s Resp. Pl.'s Proposed Findings ¶ 89. The Air Force later 'ordered, in a memorandum dated January 24, 1997, that all of the L-coded data be deleted from OLVIMS. Pl.'s Ex. 22 (Ozburn memo.). At that date, however, the Air Force still was taking the position that inspections of vehicles were part of the vehicle assessment required by the Contract, as the memorandum stated that no more inspections were to be allowed because the assessment period was over. *Id.*[14] After initially authorizing Fleetpro's own WIP program for keeping records of repairs needed, *see* Pl.'s Ex. 2 at 5, ¶ 12.b (contracting officer's final decision), on April 4, 1997, the Air Force ordered that the WIP

system be shut down. *Id.;* Pl.'s Ex. 50 (Karzon memo.).

It then initiated a thorough inspection of every vehicle repaired by Fleetpro, checking for twice as many categories of deficiencies as previously done. Pl.'s Ex. 38 (Dodson depo. tr. p. 116). Air Force personnel ultimately told Tecom that its contract was in jeopardy if Fleetpro were not terminated. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 129–31, 133. By late May, the performance standards of the Contract were met by Fleetpro. Def.'s Resp. Pl.'s Proposed Findings ¶ 128.

## C. Principles of Contract Interpretation

▮ As the causes of action in this case arise from a contract between the parties, prior to analyzing the particular claims before the Court it would be useful to first consider the principles courts must follow to interpret contracts. The purpose of interpreting a contract is, of course, to "accomplish the intentions of the parties." *In re Binghamton Bridge,* 70 U.S. (3 Wall.) 51, 74, 18 L.Ed. 137 (1865); *see also Intergraph Corp. v. Intel Corp.,* 241 F.3d 1353, 1354 (Fed.Cir.2001). The Court will interpret a contract in such a way as to give meaning to all the provisions of the contract in light of the parties' intent at the time they entered the agreement. A contract must be "interpreted so· as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States,* 216 Ct.Cl. 221, 236, 575 F.2d 855 (1978); *see also, e.g., Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983).

▮ The Court will first consider the plain language of the contract's terms. *See,*

---

14. The end to inspections was ordered despite the fact that the fleet's vehicles were government furnished property ("GFP"), *see* Def.'s Resp. Pl.'s Proposed Findings ¶ 34, and when GFP is transferred between two different private custodians,

"the relinquishing and gaining custodians may take a property inventory" and "account for lost, damaged, or destroyed property." *Id.* ¶ 36 (agreeing to quotes from AFMAN 23–110).

*e.g., Forman v. United States,* 329 F.3d 837, 842 (Fed.Cir.2003); *Gould, Inc.,* 935 F.2d at 1274. If a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning. *See, e.g., Moran v. Prather,* 90 U.S. 492, 499, 23 L.Ed. 121 (1874); *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996); *Elden v. United States,* 223 Ct.Cl. 239, 617 F.2d 254, 260–61 (1980). "A contract term is unambiguous if there is only one reasonable interpretation." *C. Sanchez & Son,* 6 F.3d at 1544; *see also Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir. 1986). The plain meaning of a contract term is "the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); *see also Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). If such a plain meaning exists, the Court would not normally consider extrinsic evidence concerning the meaning of unambiguous terms. *See Brawley v. United States,* 96 U.S. 168, 173–174, 13 Ct.Cl. 521, 24 L.Ed. 622 (1878); *Butz Eng'g Corp. v. United States,* 204 Ct.Cl. 561, 499 F.2d 619, 628–629 (1974). Evidence of trade practice and custom, however, may be considered to explain even facially unambiguous terms "where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract." *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 752 (Fed.Cir.1999).

■ If a contract term does not have a plain meaning, it is ambiguous, and the Court must then determine whether the ambiguity is patent or latent. *L. Rosenman Corp. v. United States,* 182 Ct.Cl. 586, 390 F.2d 711, 713 (1968). A patent ambiguity in a contract is one that is, on its face, glaring and obvious. This has been described as encompassing "an obvious omission, inconsistency, or discrepancy of significance," *Beacon Construction Co. of Mass. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 876 (1963). *See also Interstate Gen. Gov't*

*Contractors, Inc. v. Stone,* 980 F.2d 1433, 1435 (Fed.Cir.1992); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 972–73 (1965). The Court must determine whether a reasonable person would find the ambiguity to be patent and glaring, on an *ad hoc* basis. *L. Rosenman Corp.,* 390 F.2d at 713; *see also Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982). A contractor may not rely on its own interpretation of patent ambiguities, but instead has a duty to seek a clarification from the government before submitting its bid. *See P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355 (Fed.Cir.2002); *Newsom,* 676 F.2d at 650; *Blount Bros.,* 346 F.2d at 973. A bidder who does not inquire into a patent ambiguity assumes the risk for any unanticipated costs incurred as a result. *Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 442 F.2d 930, 935 (1971); *Dynamics Corp. v. United States,* 10 Cl.Ct. 275, 280 (1986).

■ If not found to be patent, then an ambiguity is latent. The Court will adopt a contractor's reasonable interpretation of a latent ambiguity under the contra proferentem rule—construing an ambiguity against the drafter. *See Newsom,* 676 F.2d at 649–50; *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418, 1947 WL 5089 (1947); *United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). If the contractor's interpretation of such a contract provision is determined to be reasonable, *see P.R. Burke Corp.,* 277 F.3d at 1355–56, the contractor will prevail against the author of the contract. *See, e.g., Underground Const. Co. v. United States,* 16 Cl.Ct. 60, 69 (1988); *Reliable Bldg. Maint. Co. v. United States,* 31 Fed.Cl. 641, 644 (1994) (citing *Newsom,* 676 F.2d at 649).

■ In order for this Court to determine whether the contractor's interpretation of the contract provision is reasonable, "the court must put itself in the place of a reasonable and prudent contractor." *Neal & Co. v. United States,* 19 Cl.Ct. 463, 473 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991). The Court will employ the ordinary meaning of the words used in an agreement unless there is evidence that the parties meant otherwise—for

instance, through the adoption of a special definition. *See Hol–Gar Mfg.*, 351 F.2d at 976. In interpreting some words, however, "the context and intention [of the parties] are more meaningful than the dictionary definition." *Rice v. United States*, 192 Ct.Cl. 903, 428 F.2d 1311, 1314 (1970). Interpreting an ambiguous phrase in light of its context requires close study of the whole portion of the contract that concerns the term in question, *see id.*, and the parties' intentions may be revealed through extrinsic evidence.[15] *See, e.g., McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed.Cir.1996); *Dureiko v. United States*, 209 F.3d 1345, 1357 (Fed.Cir.2000); *McGrew Bros. Sawmill*, 224 Ct.Cl. at 743. Extrinsic evidence may include negotiations between the parties in advance of the agreement, *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972), as well as the course of dealings between the parties after the agreement was entered into but before the current dispute arose. *Coast–to–Coast Fin. Corp. v. United States*, 45 Fed.Cl. 796, 801–02 (2000) (citing *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233, 1240 (1970)) ("The interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight."); *Jansen v. United States*, 170 Ct. Cl. 346, 344 F.2d 363, 369 (1965) ("It is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention.").

### III. ANALYSIS

#### A. Tecom's Motion for Summary Judgment

The Court will first consider Tecom's motion (and the corresponding portions of the Air Force's cross-motion). As mentioned above, Tecom has moved for judgment on Count II of its complaint, for breach of contract, and on Counts III and IV, for breach of warranties; and also has moved for partial summary judgment concerning its damages.

#### 1. Count II—Breach of Contract

█ Tecom argues that under the Contract, it is entitled to special compensation for the repair of defects existing in the fleet as of the Contract start date, to the extent that more than 355 hours were needed to make these repairs. This claim is based on the Contract provision entitled "Delayed/Deferred Maintenance at Start of Contract," which reads in relevant part:

> On the contract start date, the required maintenance actions will not exceed 25 labor hours per 100 vehicle equivalents and there will not be any overdue scheduled/preventive maintenance and special inspections/test. If either of these standards are exceeded, the incoming contractor shall reduce this backlog and will be compensated for this initial reduction IAW the over and above hourly rate and material costs as verified by invoices input into the OLVIMS.

PWS ¶ 5.5.1, Pl.'s Ex. 5 at 43. The parties agree that "25 labor hours per 100 vehicle equivalents," given the size and composition of the fleet, equaled 355 labor hours. *See* Def.'s Resp. Pl.'s Proposed Findings ¶ 17. It is also undeniable that the contract start date was December 1, 1996. *See id.* ¶ 2; Pl.'s Ex. 1 at 3, ¶ 7; Pl.'s Ex. 1 at 45 (Attachment 6 to Contract). The terms to be interpreted, then, are "Delayed/Deferred Maintenance," "required maintenance actions," and "backlog." [16]

The last of these terms, "backlog," is not defined in the Contract, but in the context it

---

15. This extrinsic evidence may include oral evidence, also known as parol evidence, *see* BLACK'S LAW DICTIONARY 1006 (5th ed.1979), which may be used to interpret ambiguous terms in a contract and is not barred by the parol evidence rule. *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972); Arthur L. Corbin, *The Parol Evidence Rule*, 53 YALE L.J. 603, 622 (1944) ("Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted and all those factors that are of assistance in this process may be proved by oral testimony.").

16. None of these terms are defined in the FAR "definitions" clause, 48 C.F.R. § 52.202–1 (1996), which was incorporated into the Contract by reference. *See* Pl.'s Ex. 1 at 26.

plainly means "the required maintenance actions" in excess of the 355 labor hours standard. The term "this backlog" in the second sentence of the paragraph unambiguously refers to the subjects of the "standards" described in the first sentence. "Backlog" appears in one other provision of the Contract, PWS ¶ 5.2.3.5.1: "The Contractor shall not allow total delayed hour backlog to exceed 25% of the total vehicle equivalents in OLVIMS. Delayed code B, D, G, K, M and R will not be used in computing the total delayed backlog hours." Pl.'s Ex. 5 at 40.[17] Neither of the two provisions employing the term "backlog" cross-reference the other.

The phrase "the required maintenance actions" is similarly not given a special definition in the Contract. Since the Contract concerns the maintenance of the Peterson AFB Complex vehicle fleet, "required maintenance" most simply and naturally would mean the maintenance of the fleet's vehicles that must be performed under the Contract. Nothing in or about the Contract suggests that the ordinary meaning of "required," connoting that which is needed or which one is obligated to do, is not appropriate for our purposes. *See McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 726–27 (7th Cir.1996) ("the body of knowledge that goes by the name of 'common sense' is part of the context of interpreting most documents"). The portion of the Contract detailing the specific tasks to be performed by the contractor, Section C–5 of the PWS, begins by stating, "[t]he contractor shall provide vehicle operations, maintenance and other services *required* by this PWS." PWS ¶ 5, Pl.'s Ex. 5 at 28 (emphasis added). It goes on to describe the specific "Vehicle Maintenance" task as follows: "The

contractor shall be responsible for all parts and *maintenance required* to maintain the vehicle fleet, TE 5e, . . . using standards established in T.O. 36–1–23 and applicable vehicle technical orders to ensure MELs of TE 9 and VOC rates established in TE 1 are met." PWS ¶ 5.2.2.1, Pl.'s Ex. 5 at 37 (emphasis added). A number of other maintenance actions that the Contract required of Fleetpro were detailed, including engine compression tests, minor repairs needing no more than two hours of labor, painting, corrosion control treatment, upholstery repair, storage, and hazardous waste disposal. *See* PWS ¶¶ 5.2.2.2–5.2.2.20, Pl.'s Ex. 5 at 37–40. The Contract also mandated: "The contractor shall document all *repair actions required* on a work order, AF Form 1823 or 1827 or computer generated equivalent, as appropriate." PWS ¶ 5.2.2.5, Pl.'s Ex. 5 at 38.

As noted above, one additional term might be of relevance in interpreting the Contract provision concerning compensation for backlog reduction. This provision bears the title "Delayed/Deferred Maintenance at Start of Contract." The portion of the Contract listing "technical definitions peculiar to this PWS", Pl.'s Ex. 5 at 16–20, contains a particular definition for "Delayed/Deferred Maintenance": "Maintenance that can be delayed/deferred without damage to vehicle/equipment or compromise of safety standards or prevents the vehicle/equipment from being used for its designed function." PWS ¶ 2.2.15, Pl.'s Ex. 5 at 17.[18] This definition is not very helpful for our purposes, as it does not tell us how one determines if maintenance *is* delayed/deferred, but instead

---

**17.** Two Air Force documents concerning LB & B's responsibilities under the expiring contract referenced a paragraph 5.2.4.4.1 of the PWS to the LB & B contract, which apparently similarly required that delayed maintenance backlog be less than "25% of the total vehicle equivalents in OLVIM[S] by contract expiration," Pl.'s Exs. 17, 18. The version of the LB & B contract submitted to the Court does not contain this paragraph. *See* Pl.'s Ex. 11 at G108967; Pl.'s Ex. 12 at G108967. Technical Exhibit 1 to the LB & B PWS, however, contains a table which includes the performance requirement for paragraph C–5.2.4.4.1, described as resting on the standard: "Delayed maintenance backlog hour shall not exceed 25% of the total vehicle equivalent (De-

layed maintenance codes B, D, G, and K are excluded)." Pl.'s. Ex. 11 at G109007–08. The description in this table does not imply that the requirement applies only at the contract's end. No defects were permitted for this requirement, which was to be monitored under the "monthly checklist" method of surveillance. *Id.*

**18.** The Court assumes this definition contains a grammatical error, for the portion beginning with "prevents" fails to parallel the rest of it. This last part probably means "without preventing the vehicle/equipment from being used for its designed function."

deals with what maintenance *can be* delayed/deferred. Moreover, the inclusion of "Delayed/Deferred Maintenance" in the heading for PWS ¶ 5.5.1 appears to be of little importance, as the Court notes that an identical provision, bearing even the same paragraph number, was included in LB & B's contract, but under the different heading, "Overdue Maintenance at Start of Contract." Pl.'s Ex. 12 at G108970, ¶ 5.5.1. Since the substance of the two provisions was exactly identical, the interchangeable use of "overdue" and "delayed/deferred" demonstrates that the heading was not intended to modify the terms of the provision.[19] *Cf. Provident Life & Accid. Ins. Co. v. Anderson,* 166 F.2d 492, 495 (4th Cir. 1948) ("Resort may be had to the caption only to explain an ambiguity in the operative part of the clause, not to create an ambiguity where none exists.").

### a. *Required maintenance backlog.*

According to Tecom, "required maintenance actions" means just what it says: maintenance work that is required under the Contract. Tecom argues that paragraph 5.5.1 is unambiguous and provides that Tecom is to be reimbursed at the over and above rate, plus payment for material costs, for reducing the amount of repair work needed as of December 1, 1996, down to 355 labor hours' worth. *See* Mem. Supp. Mot. for Partial Summ. J. ("Pl.'s Mem.") at 7; Pl.'s Mem. Opp. Deft. Mot. Summ. J. & Reply at 3–5 ("Pl.'s Reply"); Tr. (April 30, 2004) at 18:12–17. Tecom interprets "required maintenance" to mean simply that which is required to be done under the Contract, primarily to meet the serviceability standards, maintain the Minimum Essential Levels and not exceed the vehicle out of commission rates. *See* PWS ¶ 5.2.2.1, Pl.'s Ex. 5 at 37.

The Air Force's interpretation of "required maintenance actions" is much more complicated, although it, too, contends that the relevant provisions of the Contract are clear and unambiguous. *See* Def.'s Opp. at 7, 9, 20–23. According to the Air Force, the "de-

layed/deferred" or "required maintenance" referenced in Transportation PWS paragraph 5.5.1 can only mean unperformed maintenance that has already been recorded in the OLVIMS database. *Id.* at 10. Under this interpretation, it is the presence of an OLVIMS record indicating that work must be done that makes it so.

Although this seems to place the cart before the horse—or, more accurately, narrows the definition of the animal so that the cart makes the horse—the Air Force labors to make this interpretation fit the text of the Contract. It notes that Tecom was required to "utilize" OLVIMS "to collect, accumulate, and maintain monthly maintenance data," PWS ¶ 5.2.3.1, Pl.'s Ex. 5 at 40, and to submit to the Functional Area Chief "monthly analysis of performance, production and deficiencies" using OLVIMS, PWS ¶ 5.2.3.4, Pl.'s Ex. 5 at 40. Air Force Manual 24–307, incorporated into the Contract, *see* PWS ¶ 5.2.1, Pl.'s Ex. 5 at 36, contains a chapter concerning "Maintenance Control and Analysis," describing a management function or unit that "plans, schedules, monitors and analyzes the maintenance requirements on vehicles and is the focal point for the vehicle data collection system, OLVIMS." AFMAN 24–307, ¶ 2.1, Pl.'s Ex. 8 at 29. Based on this, the Air Force argues, "[t]hus, OLVIMS is the database which contains the information as to the quantity, condition and maintenance status of the vehicle fleet. To assess those aspects, one only has to review the database." Def.'s Opp. at 14–15.

During oral argument, counsel for the Air Force also pointed to paragraph 5.2.3.5.1 of the Transportation PWS, discussed above, as demonstrating the connection between a maintenance backlog and OLVIMS. Tr. (April 30, 2004) at 86:1, 5–9. As its proof that the 355 hour limit on required maintenance was not exceeded, the Air Force cites an OLVIMS printout of a "delayed maintenance report" purporting to represent the status of the fleet as of December 2, 1996. Def.'s Opp. at 10 (citing Def.'s Proposed Findings ¶ 26); *see* Def.'s App. at 77–81.

---

19. There is no definition of "overdue maintenance" in the LB & B contract. *See* Pl.'s Exs. 11–12.

This report shows 600.7 delayed hours, which the Air Force maintains is less than 355 hours—presumably based on handwriting on the last page of the printout which suggests that five or six columns of hours (codes B, D, G, K, M, and possibly P) should be excluded as "exception hours" according to "RS–19." *See* Def.'s App. at 81.[20]

But if, as it appears, "RS–19" refers to the "Required Service" table in Technical Exhibit 1 to the Transportation PWS, *see* Pl.'s Ex. 5 at 70–76 (TE–1–6 through TE–1–12), then this anonymous handwriting does nothing to demonstrate that OLVIMS is the basis for the backlog computation under paragraph 5.5.1. The Air Force seems to suggest that this handwritten notation links the two backlog provisions—the one at issue in this case, concerning backlog maintenance at the Contract start date (PWS ¶ 5.5.1), and the one that applies during the course of Tecom's performance (PWS ¶ 5.2.3.5.1). As noted above, the latter provides a computation of "delayed hour backlog" that is based on OLVIMS and exempts certain codes (B, D, G, K, M and R). *See* Pl.'s Ex. 5 at 40. The RS–19 entry in Technical Exhibit table, however, refers to Tecom's obligation under a different paragraph: Transportation PWS paragraph *5.2.3.5,* concerning *when* delayed maintenance is to be performed. *See id.* at 75 (TE–1–11). The RS–19 entry says nothing about the computation of delayed hour backlog, and says nothing about OLVIMS or about disregarding any maintenance codes. *Id.* Not only is there no "RS" entry concerning PWS ¶ 5.2.3.5.1, but there is none concerning the relevant paragraph for this lawsuit, PWS ¶ 5.5.1. *See* Pl.'s Ex. 5 at 70–76.[21] In any event, the Air Force argues that the "required maintenance actions" backlog provi-

sion, Transportation PWS ¶ 5.5.1, must be interpreted in light of the provisions of the Contract requiring the use of OLVIMS to keep maintenance records.

The difficulty with the Air Force's interpretation is that paragraph 5.5.1 does not contain any reference to OLVIMS records as the basis for any backlog calculation. While it is true that Transportation PWS paragraph 5.2.3.5.1 provided that Tecom "shall not allow total delayed hour backlog to exceed 25% of the total vehicle equivalents in OLVIMS," and stipulated that "[d]elayed code B, D, G, K, M and R will not be used in computing the total delayed backlog hours," Pl.'s Ex. 5 at 40, this obligation of Tecom during *its* performance of the contract has nothing to do with whether and to what extent "required maintenance actions" *as of the contract start date* exceeded 355 hours. Although the text of paragraph 5.2.3.5.1 demonstrates that for purposes of that particular "delayed hour backlog" calculation OLVIMS was to be used, *paragraph 5.5.1 is silent* on the matter. If the Air Force intended the paragraph 5.2.3.5.1 computation to be followed in determining the backlog of "required maintenance actions," it could easily have cross-referenced that provision. Instead, it employed the "25 labor hours per 100 vehicle equivalents" formulation, with no reference to OLVIMS records and no "exception" for any OLVIMS codes. The omission of any reference to OLVIMS in calculating the "required maintenance actions" is all the more telling, when one considers that paragraph 5.5.1 *does* refer to OLVIMS for purposes of computing compensation to the incoming contractor: "the incoming contractor shall reduce this backlog and will be compensated for this initial reduction IAW the over

---

**20.** It is not altogether clear if the notation on this report is meant to indicate that the fifty hours falling under category "P" are "exception hours." *See* Def.'s App. at 81 (slash marks through headings of categories B, G, D, K, M, and P, but notation reads "Exception Hrs. B, D, G, K, M,"). Subtracting the "exception hours" would result in total delayed hours of either 181.3 or 131.3, depending on the treatment of category P.

**21.** Although it might make more sense for this anonymous handwritten notation to refer to the "RS" tables for the LB & B contract, inasmuch

as it is the reduction of *their* maintenance backlog that would trigger the compensation provision PWS ¶ 5.5.1, this is clearly not the case. The "RS–19" for LB & B has to do with vehicle-out-of-commission rates, and mentions neither hours nor maintenance codes. *See* Pl.'s Ex. 11 at G109002–05 (TE 1–12–15). There is no "RS" entry for the maintenance backlog at contract's end. A description of LB & B's 25 percent delayed maintenance backlog hours limit, excluding maintenance codes B, D, G, and K, is found in RS–31. Pl.'s Ex. 11 at G109007–08 (TE–1–17–18).

and above hourly rate and material costs as verified by invoices input into the OLVIMS." Pl.'s Ex. 5 at 43.

The parties agree that under the Contract, as well as under LB & B's contract, the contractors were required to create work orders, recorded in OLVIMS, for all repairs that were required to maintain the fleet. *See, e.g.,* Def.'s Resp. Pl.'s Proposed Findings ¶¶ 12, 14–15, 25–28. The Contract and documents incorporated into it make several references to the obligation of contractors to input maintenance information into OLVIMS, including provisions the Air Force has not specifically identified. For instance, Air Force Manual 24–307 contains a provision entitled "Work Order Control for Delayed Maintenance" that references the delayed maintenance codes of the OLVIMS, and the delayed work order generated through OL-VIMS, and notes that a maintenance control officer "uses the delayed maintenance report to verify shop backlog." Pl.'s Ex. 8 at 31, ¶¶ 2.6.1–2.6.4. But what all of these references to OLVIMS show is that the Air Force was hardly shy about mentioning the computer system whenever it was necessary. Its absence from the "required maintenance actions" calculation, which is found in a provision (PWS ¶ 5.5.1) that is nevertheless clear and unambiguous, can hardly be a mistake. The point of paragraph 5.5.1, after all, was to have the Air Force bear the risk of excessive maintenance work inherited by the incoming contractor. Whether this work was listed in OLVIMS or not does not affect whether it needed to be done, and one can bet that if OLVIMS identified thousands of hours of backlog delayed maintenance that, in fact, had already been performed by LB & B, the Air Force would not be arguing that Tecom should be paid extra compensation for reducing this phantom backlog.

In seeking to add words to paragraph 5.5.1 that are not there, the Air Force would place Tecom at the mercy of LB & B. It argues that OLVIMS is the source for the backlog calculation, for all delayed maintenance would show up in OLVIMS if the outgoing contractor had met its contractual obligation. But the flaw in this argument is apparent when one considers that the Air Force also

argues that the backlog at Tecom's contract start date should be calculated in the same manner as the 25 percent limit on backlog during LB & B's contract performance—by using OLVIMS data but excluding certain delayed code categories. *See* Def.'s Opp. at 10 (citing Def.'s Proposed Findings ¶ 26); Def.'s App. at 77–81. If one assumes that all required maintenance will show up in OL-VIMS merely because the LB & B contract required it, then under the Air Force's approach it should also follow that the delayed maintenance backlog can never exceed 25 percent—for the LB & B contract apparently required this, too. *See* Pl.'s Ex. 11 at G109007–08. This interpretation of the Contract—rejected by the Court because it contradicts the plain language of PWS ¶ 5.5.1—thus also suffers from the vice of rendering paragraph 5.5.1 meaningless, in violation of basic contract interpretation principles. *See, e.g., Arizona,* 216 Ct.Cl. at 236, 575 F.2d 855; *Johnson Controls,* 713 F.2d at 1555. And it would be irrational for this provision, which compensates an incoming contractor for rectifying the delinquency of the outgoing contractor, to be based solely on the records created by the outgoing contractor. The plain text does not itself produce such an irrationality, and it should not be contorted to achieve this result.

What makes the Air Force's argument all the more unusual is that the November, 1996 joint inspections indisputably revealed the existence of at least "2500 to 3000 backlog maintenance hours over and above the PWS allowance." Pl.'s Ex. 19 at G100029 (CDR number 002). Had LB & B entered the results of these joint inspections into the OLVIMS database at that time, then even under the Air Force's current interpretation of backlog, Tecom would be entitled to some special compensation under PWS ¶ 5.5.1. The Air Force curiously argues that this data could not have been entered into OLVIMS because the inspections were "wrongfully" done, Def.'s Reply at 8, "unauthorized," *id.* at 8 n. 2, 9, an "improper means," Tr. (April 30, 2004) at 98, and an "improper" attempt by Tecom to accelerate the recognition of repairs that should go undetected until the next scheduled shop appointment for each vehicle. *Id.* at 100. The Air Force position

is that it must close its eyes to any maintenance needs of the fleet that are identified in any manner other than during a regularly-scheduled inspection. *See, e.g.,* Def.'s Opp. at 11; Def.'s Reply at 5–6. Thus, it goes to great lengths to proffer an interpretation of the Contract that somehow forbids the inspection of vehicles during a joint assessment. Although this issue is of greater relevance to some of the other counts in Tecom's amended complaint, the Court will discuss it here, since the Air Force's argument pivots upon it.[22]

#### b. The joint vehicle assessment.

The Air Force, echoing the argument discussed above concerning the indispensability of OLVIMS records, contends, "taking the contract as a whole, reveals that the phrase 'required maintenance actions' means only those actions the need for which was uncovered in the ordinary course of performance of the outgoing contractor's contract, but had yet to taken by the outgoing contractor upon contract change over." Def.'s Reply at 5. Nothing in the Contract even so much as hints that the required maintenance backlog, or even the entry of OLVIMS records, is restricted to repairs "uncovered in the ordinary course of performance" of LB & B's contract. Furthermore, both the LB & B contract and Tecom's Contract contained this identical provision:

> 5.5.2 *Vehicle Assessment.* At contract termination, the incumbent contractor, incoming contractor, and FAC shall jointly assess all vehicles to be transferred to the new contract or Government for quantity, condition, and maintenance status.

Pl.'s Ex. 5 at 43; Pl.'s Ex. 11 at G108970.

Thus, the Air Force, LB & B, and Tecom were all required to "jointly assess all vehicles" at contract termination. One would think that the repairs uncovered during this joint assessment would be "uncovered in the ordinary course of performance," and thus would be compensable under the Air Force's

interpretation of PWS ¶ 5.5.1. It bears repeating that the November, 1996 joint inspections were called the "joint assessment" by the Air Force when they were on-going and for the next month or two thereafter, *see* Pl.'s Exs. 15–19, 22, 29, 31, 52, and revealed thousands of hours of required maintenance, just prior to the termination of the LB & B contract. To avoid paying for these maintenance actions, the Air Force further refines its argument, so that "[r]equired maintenance actions are those discovered during a vehicle's regularly scheduled maintenance service call." Def.'s Reply at 3.

But since nothing in either contract restricts the required maintenance backlog (or for that matter the entry of OLVIMS records) to items identified during the aforementioned service calls, the Air Force is reduced to arguing that the November 1996 inspections were "improper," "wrongfu[l]," and "unauthorized." *See, e.g.,* Def.'s Reply at 8–9. The Air Force reasons that, while joint assessments might be in the ordinary course of performance, inspections *cannot* be a part of these assessments, and thus the November inspections were not in the ordinary course, and their fruits should be ignored.

The Court rejects this gloss on the Contract for a number of reasons. First, the Contract contains no language to support the claim that only repairs uncovered in the ordinary course of contract performance may count toward the backlog. Second, the November inspections were done with Air Force participation, *see, e.g.,* Pl.'s Ex. 14 (Contracting Officer's minutes noting Air Force involvement in inspection of 71 vehicles, and stating that the FAC approved the entry of the results into OLVIMS); Pl.'s Exs. 17–18 (Air Force describes "the government preliminary assessment of 150 vehicles"), and could hardly be characterized as unauthorized or wrongful. Regardless of whether the joint assessment provisions of the contract required the inspection of every vehicle, it is undisputed that as many as 236 were

---

**22.** Evidence supports the conclusion, moreover, that many of the needed repairs identified in the joint inspections had been or should have been identified during regularly-scheduled inspections. *See* Pl.'s Ex. 14 (according to meeting

minutes signed by the Contracting Officer: "It was determined that a good portion of the vehicles inspected had recently been in the shop for maintenance and returned to service with severe safety violations.").

inspected prior to contract turn-over, and this was called an assessment at the time. Under any interpretation of the Contract, this would be in the ordinary course of performance.

The Air Force tries to avoid the undisputed facts by arguing, as a matter of law, that no matter what it called them at the time, the inspections could not have been the joint assessment mandated by the two contracts. It claims that "assessment," which is not defined in the Contract, not only does not mean inspection, but cannot mean it. This argument rests on two legs: a dictionary definition of "assess," and the presence of an inert definition for the term "joint serviceability inspection" in the Contract. This is contrary to common sense, as well as the dictionary definitions to which the Air Force repairs.

The Air Force cites a dictionary definition of assess as "to determine the importance, size, or value," Def.'s Opp. at 13 (quoting Webster's Collegiate Dictionary 69 (10th ed.)), and then jumps to the conclusion that only OLVIMS may be used in this process. Of course, the provision in the Contract calls for the parties to "jointly assess all vehicles . . . for quantity, condition, and maintenance status." PWS ¶ 5.5.2, Pl.'s Ex. 5 at 43. Why cannot one *determine* the condition or maintenance status of cars by *inspecting* them? Certainly, there is nothing in the definition of assess, as commonly understood or from a dictionary, that precludes an inspection.[23]

Nor does the presence of a definition for a "joint serviceability inspection" rule out the possibility that an inspection may be encompassed within the meaning of the term assessment. The Transportation PWS defines "joint serviceability inspection" as an "[i]nspection of vehicles/equipment/facilities by Government and contractor representation to inventory and determine their serviceability and physical condition." PWS ¶ 2.2.21, Pl.'s

Ex. 5 at 17. The Air Force argues that either this term or "assess" would be superfluous if it were accepted that one may inspect in the course of assessing. Def.'s Opp. at 18. This does not logically follow, of course, for "assess" may be *broader* than an inspection, and in any event the use of synonymous terms in different contract paragraphs does not render any of the terms meaningless. Moreover, the term "Joint Serviceability Inspection" appears nowhere else in the Contract but where it is defined, and thus under the Government's approach could not help but be superfluous.

The Government cites the "detailed inspection requirements" for government-furnished equipment and government-furnished materials—presuming that these call for joint serviceability inspections—as further proof that the joint vehicle assessment is not an inspection. Def.'s Reply at 11. The problem with this argument is that, just like the vehicle assessment paragraph, the two paragraphs concerning an inventory of equipment and of materials do not once use the words "inspection" or "inspect," let alone the term "joint serviceability inspection." *See* PWS ¶¶ 3.1.2.1, 3.1.3, Pl.'s Ex. 5 at 21–22. The equipment provision requires a "joint inventory," and explains that the "contractor and the government representative shall jointly determine the working order and condition of all equipment and document their findings." PWS ¶ 3.1.2.1, Pl.'s Ex. 5 at 21–22. The materials provision requires that the "initial stock of materials provided shall be inventoried not later than 5 working days before contract start by the contractor and a government representative." PWS ¶ 3.1.3, Pl.'s Ex. 5 at 22. The fact that these paragraphs are longer (and hence more "detailed") than the vehicle assessment one is hardly significant, particularly since the latter *is* of comparable length when the required maintenance backlog provision is also taken into account.

23. Indeed, one commonly-used version of the dictionary cited by the Air Force for the definition of "assess" adds the following to that very same definition: "to analyze critically and judge definitively the nature, significance, status, or merit of." Webster's Third New International Dictionary 131 (1976). "Determine" in turn is defined as "to obtain definite and first hand knowledge of as to character, location, magnitude, or quality," *id.* at 616. These definitions of both "assess" and "determine" are remarkably similar to the first definition listed for "inspect," which is "to view closely and critically (as in order to ascertain quality or state, detect errors, or otherwise appraise)." *Id.* at 1170.

More to the point, if one were to argue that these other government-furnished properties are scrutinized by way of a "joint serviceability inspection," because an "inventory" is taken, it follows that the joint vehicle assessment, too, is done via a "joint serviceability inspection"—which is used to "determine th[e] serviceability and physical condition" of "vehicles/equipment/facilities." PWS ¶ 2.2.21, Pl.'s Ex. 5 at 17. This makes even stronger the case that assessments include inspections, under the Contract.

It is not reasonable to interpret the Contract to forbid inspections from being a part of the joint vehicle assessment required by paragraph 5.5.2. And even were "assess" and "assessment" to be considered ambiguous merely because such household words were not accompanied by detailed definitions in the Contract, the ambiguity would be latent, not patent. The use of these words does not create so glaring an ambiguity that clarification was required—to interpret "assess" to entail an inspection does not create any irreconcilable conflicts with other provisions of the Contract. *See P.R. Burke Corp.*, 277 F.3d at 1355; *Interstate General*, 980 F.2d at 1435; *Newsom*, 676 F.2d at 650. Moreover, in the scheme of things, the joint assessment is not even the primary concern of the Contract, which was to have Tecom maintain the vehicle fleet, but was an activity that only occurred at contract termination. Any ambiguity is thus latent, as different circumstances might have called for different interpretations—for instance, had the initial inspections confirmed the information found in OLVIMS, it may well have been unreasonable for Tecom to demand any further joint inspections.[24] And, as noted above, it cannot be denied that during the time of performance, the Air Force personnel responsible for both Tecom's and LB & B's contracts stated time and again that the inspections were the paragraph 5.5.2 *assessments*. *See, e.g.*, Pl.'s Exs. 15–19, 22, 29, 31, 52. Such actions are given "great, if not controlling weight" in

contract interpretation. *Coast–to–Coast*, 45 Fed.Cl. at 801–02; *see also Max Drill*, 427 F.2d at 1240; *Jansen*, 344 F.2d at 369. The only reasonable conclusion is that the joint inspections constituted the joint "vehicle assessment" required by paragraph 5.5.2.

### c. The undisputed facts clearly establish liability.

The rest of the Government's attempts to overcome the plain and ordinary meaning of the relevant Contract provisions are also unconvincing. The Air Force contends that to follow the special compensation requirement of paragraph 5.5.1, without adding the qualifier that required repairs were uncovered during regularly-scheduled maintenance and entered into OLVIMS, would have two negative consequences. First, if OLVIMS were not the source of the repair data, then "the Government would los[e] the ability to manage its maintenance budget." Def.'s Opp. at 11. But if the Air Force monitored more closely the activity of its contractor—inspecting its work as thoroughly as it did Fleetpro's, *see* Pl.'s Ex. 38 (Dodson depo. tr. p. 116)—then the maintenance backlog would have neither accumulated nor caught it unaware. The Air Force also argues that the compensation sought by Tecom is for work that could have been done when each vehicle came into the shop for regular maintenance, and thus would be a "double payment" under this fixed fee contract. Def.'s Opp. at 16. The Air Force does not seem troubled by the possibility that the outgoing contractor was paid for work it failed to do, though. Both of these arguments, moreover, amount to a complaint that the Government does not like the express terms of the Contract it drafted. It chose not to include the qualifier that backlog repairs are only those previously recorded in OLVIMS; and these repairs cannot result in a "double payment" for the simple reason that paragraph 5.5.1 limits the

---

**24.** The Air Force also argues that it would have been impossible for all 563 vehicles of the base fleet to have been inspected in thirty days. Def.'s Opp. at 15. Not only is this assertion unsupported, but the evidence suggests that 86 vehicles were inspected in four days. *Compare* Pl.'s Ex. 17 (150 vehicles assessed through November 22)

*with* Pl.'s Ex. 19 (236 vehicles inspected through November 26). Moreover, the Contract states that the joint assessment must occur at contract termination, but does not require that it be done within any specific time period. PWS ¶ 5.5.2, Pl.'s Ex. 5 at 43.

amount of inherited repairs that were the responsibility of Tecom.

The Air Force further argues that, since non-safety repairs may be deferred, it should have been allowed to defer them under the Contract and thereby avoid paying Tecom under paragraph 5.5.1. Def.' Opp. at 21–23. But whether or not it could decide to further delay these repairs does not nullify the promise to pay special compensation to Tecom for making them. Moreover, this argument ignores the limit on the amount of delayed repairs that is imposed under Transportation PWS paragraph 5.2.3.5.1, which ordered Tecom to "not allow total delayed hour backlog to exceed 25% of the total vehicle equivalents in OLVIMS." Pl.'s Ex. 5 at 40.

In sum, under the Contract, Tecom was promised special compensation for making any vehicle repairs the base fleet needed as of December 1, 1996, to the extent that more than 355 labor hours would be expended. The undisputed facts demonstrate that labor hours far in excess of 355 were needed to make the inherited repairs. See, e.g., Pl.'s Exs. 17–19. Tecom is entitled to summary judgment as to the Government's liability under the second cause of action in its Amended Complaint. Accordingly, the motion is GRANTED as to the breach of contract count, and the Government's cross-motion is DENIED as to this count. Tecom may be compensated at "the over and above hourly rate" and for "material costs" incurred to reduce this backlog to 355 labor hours' worth of repairs, regardless of whether the repairs were previously entered into OLVIMS and regardless of how they were detected.[25]

2. *Counts III and IV—Breach of the Implied Duties to Cooperate and Not to Hinder Performance*

Tecom alleges in its Amended Complaint that the Air Force breached both the implied duty of cooperation and the duty not to hinder or interfere with performance. Complaint ¶¶ 40–45. In moving for summary judgment on these claims, Tecom argues that the duty of good faith and fair dealing has

also been breached, Pl.'s Mem. at 29–34, and characterizes these as "three related, yet distinct implied duties," which it groups under the rubric "contractual duties to work cooperatively." Id. at 28. Although it takes the position that the first two duties listed above protect a contractor from acts that are merely unreasonable, id. at 29, Tecom argues that the Air Force's conduct violates the sterner standard of bad faith. Id. at 30. For its part, the government suggests that the presumptions of regularity and good faith conduct apply here, raising the plaintiff's evidentiary burden to clear and convincing proof of a breach of these duties. See Def.'s Opp. at 25. In order to rule on the parties' motions for summary judgment on these causes of action, the Court must first determine the standard of proof required—which may turn on whether proof of bad faith is a necessary element to demonstrate a breach of these duties. The inter-relationship of these three implied duties and the impact of the presumption of good faith conduct on proof of their violation must necessarily be determined before Tecom's motion, and the Air Force's cross-motion, can be considered.

a. *The presumptions of regularity and good faith conduct.*

The presumptions that government officials perform their duties with regularity and in good faith are often-invoked, but never satisfactorily explained. At times, the concept is presented as being one, unitary presumption, see, e.g., Pauley Petroleum Inc. v. United States, 219 Ct.Cl. 24, 52, 591 F.2d 1308 (1979) (referencing "the presumption of government regularity and good faith"); Alaska Airlines v. Johnson, 8 F.3d 791, 796 (Fed.Cir.1993) (using "regularity" and "good faith" interchangeably), while on occasion it is noted that "the presumption of regularity of government action [is] a related but different presumption" from that of "governmental good faith." United States v. Roses Inc., 706 F.2d 1563, 1566–67 (Fed.Cir.1983).

25. Of course, these repairs may not include the safety repairs that were separately compensated under the first modification. See Pl.'s Ex. 23.

### i) The presumptions in the Supreme Court

The broad concept is traceable to the early days of our Republic, and has its roots in English law.[26] It first appears in Supreme Court jurisprudence, without attribution, in 1816: "It is a general principle to presume that public officers act correctly until the contrary be shown." *Ross v. Reed,* 14 U.S. (1 Wheat.) 482, 486, 4 L.Ed. 141 (1816). Although *Ross* involved public officials—a land surveyor and commissioner issuing a grant—this evidentiary presumption was not limited to governmental actions. As the Supreme Court, speaking through Justice Joseph Story, explained a decade later:

> By the general rules of evidence, presumptions are continually made in cases of private persons of acts even of the most solemn nature, when those acts are the natural result or necessary accompaniment of other circumstances.... [T]he law ... presumes that every man, in his private and official character, does his duty, until the contrary is proved; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption, according to the maxim, *omnia presumuntur rite et solemnitur esse acta, donec probetur in contrarium.*

*Bank of the United States v. Dandridge,* 25 U.S. (12 Wheat.) 64, 69–70, 6 L.Ed. 552 (1827) (footnote omitted). Thus, in *Bank of the United States,* it was held that a person who had openly served as cashier of a bank is presumed to have been appointed through the process required by act of Congress, although the bank's board lacked written records to confirm this. *Id.* at 70. As the Court stated in brief, "the acts of artificial persons afford the same presumptions as the acts of natural persons. Each affords presumptions, from acts done, of what must have preceded them, as matters of right, or matters of duty." *Id.*

The presumptions of regularity and good faith conduct appear to be the offspring of different, but related presumptions. One, a variant of "innocent until proven guilty," is that "where a person is required to do an act, the omission to do which would be criminal, his performance of that act will be intended until the contrary be shown." [27] The other is the familiar evidentiary treatment of matters performed in the regular course of business. *See* 1 SIMON GREENLEAF, A TREATISE ON THE LAW OF EVIDENCE 137–38 (John H. Wigmore ed., 16th ed. Little, Brown, & Co. 1899) ("The like presumption is also drawn from the usual course of men's private offices and business, where the primary evidence of the fact is wanting.").

Instead of "good faith," the early cases express a presumption in terms of doing one's "duty," or acting "correctly." *See, e.g., Rankin v. Hoyt,* 45 U.S. (4 How.) 327, 335, 11 L.Ed. 996 (1846); *Ross,* 14 U.S. at 486. The typical occasion for this presumption was when an act of a public official required certain predicate acts (or facts) to be lawful. For instance, it was presumed that a customs collector ordered an appraisal of imported wool, *Rankin,* 45 U.S. at 335; that Union forces controlled the area for which a permit to buy cotton was issued, *Butler v. Maples,* 76 U.S. (9 Wall.) 766, 777–78, 19 L.Ed. 822 (1869); that a seizure of property by request of the Attorney General was pursuant to a presidential order, *The Confiscation Cases,* 87 U.S. (20 Wall.) 92, 108–09, 22 L.Ed. 320 (1873); that a law which would deprive a commissioner of the power to issue title to land had not yet been promulgated and become effective in his portion of a Mexican

---

**26.** *See* THOMAS STARKIE, A PRACTICAL TREATISE ON THE LAW OF EVIDENCE 756 (George Sharswood ed., 10th Am. ed., T. & J.W. Johnson & Co. 1876) (citing COKE UPON LITTLETON for the maxim *"omnia presumuntur rite et solenniter esse acta, donec probetur in contrarium"*); *see also The King v. Hawkins,* 10 East. 211, 216 (K.B.1808) (citing precedents for the proposition that "the presumption, that every man has conformed to the law, shall stand till something shall appear to shake that presumption").

**27.** 3 THOMAS STARKIE, A PRACTICAL TREATISE ON THE LAW OF EVIDENCE 1249–50 (Wells & Lilly 1826); *see also Hartwell v. Root,* 19 Johns. 345, 347 (N.Y.Sup.Ct.1822) (describing the omission as a "culpable neglect of duty"); *Williams v. East India Co.,* 3 East. 192, 199–200 (K.B.1802) (citing authorities for presumption that one does not engage in "criminal neglect of duty," and that " 'a person shall be presumed duly to execute his office until the contrary appear' ") (quoting *Lord Halifax's case,* Bull. N.P. 298).

state at the time the title was issued, *Gonzales v. Ross*, 120 U.S. 605, 615–16, 7 S.Ct. 705, 30 L.Ed. 801 (1887); that the President reviewed and approved the court martial records brought before him, *United States v. Page*, 137 U.S. 673, 679–80, 26 Ct.Cl. 499, 11 S.Ct. 219, 34 L.Ed. 828 (1891); and that the required public notice had been given for a local election to approve the issuance of bonds, *Knox County v. Ninth National Bank*, 147 U.S. 91, 96–97, 13 S.Ct. 267, 37 L.Ed. 93 (1893).[28] Good faith, in the sense of the proper motivation for these acts, was never really at issue; the judges were presuming *that* something happened, not *why*.

In these early cases, the Supreme Court understood the presumption of regularity to be a mere evidentiary presumption and nothing more. Thus, the presumption was only prima facie evidence, subject to rebuttal. *See, e.g., Butler*, 76 U.S. at 778 ("But a *prima facie* case, with nothing to rebut it, is a case made out."). The burden placed on the party seeking to rebut the presumption was nothing special. *See, e.g., id.* (noting "there was nothing to rebut the presumption of fact arising from the grant of the permit"); *Nofire v. United States*, 164 U.S. 657, 660, 17 S.Ct. 212, 41 L.Ed. 588 (1897) (stating "one who claims that any such prerequisite did not exist must affirmatively show the fact"); *Rankin*, 45 U.S. at 335 (recognizing "the absence of testimony to the contrary"); *United States v. Royer*, 268 U.S. 394, 398, 61 Ct.Cl. 1030, 45 S.Ct. 519, 69 L.Ed. 1011 (1925) (same).

Some confusion on this point might have been caused by a 1926 Supreme Court decision concerning a federal officer's decision to dispose of alien property seized from an enemy nation. The Supreme Court added the modifier "clear" to the maxim: "The presumption of regularity supports the official acts of public officers and, in the absence of *clear evidence* to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) (emphasis added). The Court cites three authorities for this proposition. *See id.* at 15, 47 S.Ct. 1. The first authority cited, *The Confiscation Cases*, says nothing about "clear evidence" being required to rebut the presumption. *See* 87 U.S. at 108–09. The other two were cases appealed from our predecessor, the Court of Claims, which concerned fees and expenses for court officers that had been approved by federal courts. *See United States v. Nix*, 189 U.S. 199, 205–06, 23 S.Ct. 495, 47 L.Ed. 775 (1903); *United States v. Jones*, 134 U.S. 483, 488, 10 S.Ct. 615, 33 L.Ed. 1007 (1890). In those cases, the Court held that "[t]he approval of a commissioner's account by a Circuit Court of the United States, under [an act of Congress], is *prima facie* evidence of the correctness of the items of that account; and in the absence of *clear and unequivocal proof of mistake on the part of the court* it should be conclusive." *Jones*, 134 U.S. at 488, 10 S.Ct. 615 (emphasis added); *see also Nix*, 189 U.S. at 205, 23 S.Ct. 495. These precedents, however, did not involve the presumption of regularity, but rather the normal deference that the Supreme Court gave to the factual determinations of lower courts. *See, e.g., Reynolds v. United States*, 98 U.S. 145, 157, 25 L.Ed. 244 (1879) ("Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case."); *Stuart v. Hayden*, 169 U.S. 1, 14, 18 S.Ct. 274, 42 L.Ed. 639 (1898) (stating that "as the Circuit Court and the Circuit Court of Appeals agreed as to what were the ultimate facts established by the evidence, this court should accept their view as to the facts unless it clearly appeared that they erred as to the effect of the evidence").

It appears that the Supreme Court's insertion of the modifier "clear" was itself a careless mistake, and not a change in the legal standard of proof to rebut the presumption. The Court continued to adhere to the established approach to rebuttal in its subsequent cases involving the presumption of regularity. *See Lewis v. United States*, 279 U.S. 63,

---

**28.** This presumption was not always employed. *See, e.g., United States v. Jonas*, 86 U.S. (19 Wall.) 598, 604–05, 22 L.Ed. 177 (1874) (rejecting presumption that inferior officer received Secretary's approval for sale of foreclosure property, and requiring written proof, when law was specifically changed to place the inferior officer's actions under tighter control).

73, 49 S.Ct. 257, 73 L.Ed. 615 (1929) (determining "the contrary is not expressly shown"); *R.H. Stearns Co. v. United States,* 291 U.S. 54, 63, 54 S.Ct. 325, 78 L.Ed. 647 (1934) ("No doubt the presumption of regularity is subject to be rebutted. It stands until dislodged."); *id.* at 64, 54 S.Ct. 325 ("Choice between two doubts should be made in such a way as to favor the presumption of official regularity."); *Klamath and Moadoc Tribes v. United States,* 296 U.S. 244, 253, 56 S.Ct. 212, 80 L.Ed. 202 (1935) (noting "the absence of findings of fact requiring conclusion to the contrary") (citing *Chemical Foundation,* 272 U.S. at 14–15, 47 S.Ct. 1).

More recently, however, the Supreme Court has been using the "clear evidence" formulation in discussing the presumption. Thus, the claim that federal prosecutors were selectively prosecuting defendants based on race must overcome the presumption of regularity, requiring "clear evidence to the contrary." *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The Court did not, however, equate this showing with "clear and convincing" evidence or any other heightened burden,[29] *see id.* at 465–68, 116 S.Ct. 1480, and concluded that a party needed "a credible showing of different treatment of similarly situated persons" in order to be allowed fact discovery. *Id.* at 470, 116 S.Ct. 1480.

The *Chemical Foundation* precedent has also taken its place in Administrative Procedure Act jurisprudence, as it was cited by the Court in *Citizens to Preserve Overton Park,*

*Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[30] The presumption of regularity was said, however, "not to shield [the Secretary of Transportation's] action from a thorough, probing, in-depth review," *id.,* and although under the arbitrary and capricious test "the ultimate standard of review is a narrow one," *id.* at 416, 91 S.Ct. 814, the Court did not suggest a heightened standard such as clear and convincing evidence was to be employed. To be sure, the Court did determine that in APA review of a decision that is explained by contemporaneous administrative findings, discovery into the mental processes of the decision maker requires as a predicate "a strong showing of bad faith or improper behavior." *Id.* at 420, 91 S.Ct. 814. But this was not an outgrowth of the presumption of regularity—which, after all, assumes the right findings were made—but rather of APA review confined to an administrative record which already contains these findings.[31]

Quite apart from questions of "regularity," the Supreme Court had presumed the existence of good faith in a large variety of contexts. As was the case with regularity, this presumption was not particular to government officials. Private persons and institutions also enjoyed it, including purchasers of land, *Leland v. Wilkinson,* 35 U.S. (10 Pet.) 294, 297, 9 L.Ed. 430 (1836); married couples confronting accusations of bigamy, *Lieng v. Sy Quia,* 228 U.S. 335, 338–39, 33 S.Ct. 514, 57 L.Ed. 862 (1913); *Gaines v. New Orleans,* 73 U.S. (6 Wall.) 642, 707, 18

---

**29.** The Court did describe a previous case as involving "convincing direct" and "indisputable evidence," *Armstrong,* 517 U.S. at 467, 116 S.Ct. 1480, but discusses the proof required to rebut the presumption not in terms of any level of factual burden but instead in terms of what was needed to be proven—discriminatory effect and purpose. *See id.* at 465–68, 116 S.Ct. 1480.

**30.** The Court in *Overton Park* may have muddied the water a bit by citing a case involving the deference given to legislative or administrative acts under the police power, see 401 U.S. at 415, 91 S.Ct. 814 (citing *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138 (1935)); the Court has since, however, clarified that mere rational basis review is not enough, as it "do[es] not view as equivalent the presumption of constitutionality afforded legislation drafted by Congress and the presumption of

regularity afforded an agency in fulfilling its statutory mandate." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 626–27, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (plurality opn.). It still on occasion confuses the two. *See, e.g., Dept. of Labor v. Triplett,* 494 U.S. 715, 723, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (stating "this sort of anecdotal evidence will not overcome the presumption of regularity and constitutionality to which a program established by Congress is entitled").

**31.** The Supreme Court appears to have based the restriction of review to an administrative record on a misreading of the legislative history of the APA. *See Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 350 n. 25 (2004).

L.Ed. 950 (1867); private carriers changing their freight rates, *ICC v. Chicago Great W. Ry. Co.*, 209 U.S. 108, 120, 28 S.Ct. 493, 52 L.Ed. 705 (1908) (noting "[t]hose presumptions of good faith and integrity which have been recognized for ages as attending human action"); foreign corporations assessing shareholders for additional contributions, *Nashua Savings Bank v. Anglo–American Land, Mtge. & Agency Co.*, 189 U.S. 221, 231, 23 S.Ct. 517, 47 L.Ed. 782 (1903); and private utilities making entries in their books for rate making purposes, *West Ohio Gas Co. v. Public Utils. Comm'n*, 294 U.S. 63, 72, 55 S.Ct. 316, 79 L.Ed. 761 (1935). Only the serious and sensational questions of bigamy and good faith in marriage seemed to place the presumption above impeachment by ordinary proof, needing instead "proof so clear, strong and unequivocal as to produce a moral conviction" of the contrary. *Lieng*, 228 U.S. at 339, 33 S.Ct. 514; *see also Gaines*, 73 U.S. at 707 ("The fact of marriage being proved, the presumptions of law are all in favor of good faith. To disprove the good faith in this case there should be full proof to the contrary ... the proof must be irrefragable.") (internal quotation marks and citations omitted).

This presumption of good faith extended to the government, typically when at issue were legislative acts, *see, e.g., Lone Wolf v. Hitchcock*, 187 U.S. 553, 568, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Hadacheck v. Sebastian*, 239 U.S. 394, 414, 36 S.Ct. 143, 60 L.Ed. 348 (1915); or the determinations of special administrative tribunals such as tax assessment boards, see *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 353, 38 S.Ct. 495, 62 L.Ed. 1154 (1918) and the cases cited therein. Good faith was also presumed in such disparate matters as court clerks obtaining security for court judgments, *Bevins v. Ramsey*, 56 U.S. (15 How.) 179, 188, 14 L.Ed. 652 (1853), or the U.S. Postmaster General determining to use his discretionary power to terminate a contract in the public interest, *Slavens v. United States*, 196 U.S. 229, 236, 25 S.Ct. 229, 49 L.Ed. 457 (1905). The presumption of good faith needed a "clear showing to the contrary" to be overcome in the police power area, *Hadacheck*, 239 U.S. at 414, 36 S.Ct. 143, and other legislative powers were

deemed wholly discretionary and beyond any inquiry into motivation, *see, e.g., Lone Wolf*, 187 U.S. at 568, 23 S.Ct. 216. *But see Minnesota v. Barber*, 136 U.S. 313, 319, 10 S.Ct. 862, 34 L.Ed. 455 (1890) (holding that good faith, and, hence, the presumption, are irrelevant to questions of constitutionality). No heightened burden of proof appears to have been suggested in other contexts. *See, e.g., Sunday Lake*, 247 U.S. at 353, 38 S.Ct. 495 ("The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party."); *Bevins*, 56 U.S. at 188 (noting "the presumption of good faith being *prima facie* in his favor").

Over the last few decades the Supreme Court has been less willing to presume good faith, particularly on the part of government actors. It has been abandoned in cases regarding claims under the Takings Clause, *see United States v. Sioux Nation*, 448 U.S. 371, 415–16, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), and the First Amendment, *see, e.g., City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (no presumption in facial challenge to mayor's discretion to license newsstands); *Mitchell v. Helms*, 530 U.S. 793, 863–64, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring in the judgment) (criticizing seven justices for presuming that religious school officials will not act in good faith). The presumption was disregarded concerning the actions of a state environmental agency. *See Alaska Dep't Envtl. Conserv'n v. EPA*, 540 U.S. 461, 507, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (Kennedy, J., dissenting). And four justices of the Supreme Court have gone so far as to question whether the presumption of good faith is still vital. *See Alden v. Maine*, 527 U.S. 706, 813 n. 43, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (Souter, J., dissenting) (stating the "presumption of the sovereign's good-faith intention to follow the laws has managed somehow to disappear in the intervening two centuries").

In the Equal Protection area, where the presumption of good faith is still indulged, the Court has not required any heightened burden of proof to rebut it. *See, e.g., Grutter*

*v. Bollinger*, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (stating "good faith on the part of a university is presumed absent a showing to the contrary") (internal quotation marks and citation omitted); *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). And in the closely-analogous circumstance of state or local officials accused of violating civil rights under color of law—cases in which improper intent is an issue and qualified immunity applies—the Supreme Court rejected judicial efforts to impose a heightened "clear and convincing evidence" standard of proof. *Crawford–El v. Britton*, 523 U.S. 574, 594–601, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

From the foregoing, it is evident that in Supreme Court jurisprudence, presumptions of regularity and of good faith had developed separately, only to intersect in cases such as *Armstrong*, in which regularity in the office (in that case, of prosecutor) required good faith. To the extent that "clear evidence" might be needed to rebut this presumption, it is when the good faith of certain very official acts of the legislative (such as lawmaking) or executive (such as prosecuting or rule-making) branch is called into question. The Supreme Court has not required clear and convincing evidence to rebut the presumption of good faith, and the *Crawford–El* opinion pretty clearly signals that it would reject this notion. As for the presumption of regularity, at most it can be said that the burden of proving the non-occurrence of predicate acts required (by law or regulation) of public officials (such as the considering of certain facts, the review of applications, the receipt of authorizations, *etc.*) falls on the party asserting their absence. No rationale has been stated

for any need to rebut this presumption with "clear evidence," and the Supreme Court has not required any heightened standard of proof in this regard.

### *ii) The presumptions in the Court of Claims and Federal Circuit*

Since the Court of Claims—the common predecessor of our Court and of the Federal Circuit—considered exclusively cases against the federal government, it was frequently presented with opportunities to analyze and apply the presumptions of regularity and good faith to the acts of public officials.[32] It did, though, on occasion have the opportunity to acknowledge that these presumptions apply to the actions of private parties, as well.[33] A review of these precedents, and the Federal Circuit authority carrying them forward, provides the context for the Court's application of these presumptions to the case at bar.

As was also true for the Supreme Court, in the Court of Claims the presumption of regularity initially developed in a manner conceptually distinct from the presumption of good faith. From the beginning, it was clearly defined and circumscribed, as explained in the 1878 opinion in *Johnson's Case*:

> [A]n act which a public officer is required to perform may be inferred from subsequent facts, when it forms a link in the chain of evidence consistent with those facts, or upon which subsequent acts depend for their validity.... [P]rior official acts may be inferred from subsequent acts and facts which are proved, and that is as far as the presumption that public officers perform their duty is correctly recognized. It is not a presumption of law or of fact

---

**32.** And, indeed, a number of the Supreme Court precedents discussed above were appeals from decisions of the Court of Claims. *See, e.g., R.H. Stearns Co.*, 291 U.S. 54, 54 S.Ct. 325; *Royer*, 268 U.S. 394, 45 S.Ct. 519; *Slavens*, 196 U.S. 229, 25 S.Ct. 229; *Page*, 137 U.S. 673, 11 S.Ct. 219.

**33.** *See, e.g., The Schooner Betsey*, 44 Ct.Cl. 506, 514, 1908 WL 766 (1909) (presuming good faith in the sale of an American ship illegally seized by France); *Briggs v. United States*, 116 Ct.Cl. 638, 648, 90 F.Supp. 135 (1950) (noting "a strong presumption" that retired sailor did not commit bigamy to defraud the government of spouse benefits); *A.L. Coupe Constr. Co. v. United States*,

134 Ct.Cl. 392, 397–98, 139 F.Supp. 61 (1956) (extending presumption of regularity to the signing of a contract by an individual who represented managing partner); *but see S.M. Jones & Co. v. United States*, 178 Ct.Cl. 16, 23–27, 371 F.2d 442 (1967) (applying but questioning applicability of presumption of regularity to the collection of an excise tax by truckers). In a case presenting somewhat of a hybrid, the Federal Circuit has recognized that the presumptions of good faith and regularity apply to the actions of government contractors. *Alaska Airlines*, 8 F.3d at 795–96 (extending presumptions to travel agents selling tickets for federal travel).

that such officers have executed all their duties in relation to any matter in controversy, arising from proof of prior circumstances, which placed them in position of obligation and ability to perform the same, without evidence of some subsequent facts which must have, or at least might have, resulted therefrom.

*Johnson's Case,* 14 Ct.Cl. 276, 278–79, 1800 WL 1010 (1878); *see also Pharis v. United States,* 16 Ct.Cl. 501, 505–06 (1880) (following *Johnson's Case*). Thus, *predicate* acts that were *required* of public officials could be presumed upon proof of their natural results, but *subsequent* acts would not be presumed merely because they were within a public official's required duties. In other words, courts will presume that acts performed had been commanded, but not that acts commanded had been performed.

This traditional distinction between subsequent and predicate actions was adhered to as the presumption of regularity developed. In *Johnson's Case,* the Court refused to presume that property was sold and the proceeds deposited into the Treasury, merely because a Treasury agent had seized it and turned it over to another agent. 14 Ct.Cl. åt 277–79. But in *McCollum v. United States,* 17 Ct.Cl. 92, 1800 WL 986 (1881), it was presumed that a contract apparently made by an Assistant Postmaster General had been approved by the Postmaster General, when official documents evidencing this contract were sent by the latter to the Court without objection. *Id.* at 100–02.

Following this formula, regularity was presumed in a wide variety of contexts, based upon subsequent official acts. As some examples, it was presumed that an Army surgeon attended an international medical conference under orders authorized by the Secretary of War, *Billings v. United States,* 23 Ct.Cl. 166, 176, 1800 WL 1417 (1888); that the internal revenue commissioner gave a taxpayer notice of the amounts and due dates for tax installment payments, *Atlantic Refining Co. v. United States,* 70 Ct.Cl. 719, 725–26, 44 F.2d 101 (1930); that the commissioner approved a waiver of the tax assessment deadline, *Riverside & Dan River Cotton Mills, Inc. v. United States,* 81

Ct.Cl. 610, 616, 11 F.Supp. 134 (1935); that Navy officials were authorized to enter into an oral contract, *Southeastern Oil Florida, Inc. v. United States,* 127 Ct.Cl. 480, 488, 115 F.Supp. 198 (1953); that the appropriate Army General had determined that counsel requested was not reasonably available to assist in a court-martial defense, *Denton v. United States,* 144 Ct.Cl. 840, 864–65, 1959 WL 7568 (1959); and that a civilian employee of the Army received his pay up until his suspension, *Mallow v. United States,* 161 Ct. Cl. 207, 221, 1963 WL 8609 (1963). Even though most of the opinions just mentioned were issued after the Supreme Court's 1926 *Chemical Foundation* decision (and several cite that opinion, *see Southeastern Oil,* 127 Ct.Cl. at 488; *Denton,* 144 Ct.Cl. at 865; *Mallow,* 161 Ct.Cl. at 221), they contained no requirement of "clear evidence" to rebut the presumption. *See, e.g., Atlantic Refining,* 70 Ct.Cl. at 726 ("In the absence of proof, it will be presumed that the collector performed his duty."); *Riverside,* 81 Ct.Cl. at 616 (stating "burden was on the plaintiff to show" lack of approval, and "[i]n the absence of such proof the presumption of official regularity is sufficient"); *Denton,* 144 Ct.Cl. at 865 (stating "any official action is presumed, in the absence of evidence indicating otherwise").

The presumption of regularity, as traditionally conceived, merely placed the burden of proof on a party claiming that predicate acts, required of public officials to support a subsequent action, had been neglected. Rebuttal did not require proof of bad faith, as innocent mistake or oversight may often be the cause of an irregularity. Some opinions, by describing the presumption in terms of a duty "properly" discharged, summoned or at least anticipated the presumption of good faith. One early example with elements of both presumptions stated:

[W]here a statute confides a discretion to an officer, a party dealing with him in good faith may *assume that the discretion is properly exercised;* and if the discretion is vested in a superior officer, while the transaction is with his subordinate, the contractor may assume in like manner that the discretion has been properly exercised, and *that the subordinate is acting in ac-*

cordance with his superior's orders and carrying out the exercise of his superior's discretion.

*McKee v. United States,* 12 Ct.Cl. 504, 528, 1800 WL 940 (1876) (emphasis added), *rev'd on other grounds,* 97 U.S. 233, 13 Ct.Cl. 531, 24 L.Ed. 911 (1878). Although this passage concerned whether contractors may rely upon representations of government officials, and not any evidentiary presumptions, it demonstrates how the presumption of good faith complemented the presumption of regularity—as a subordinate acting in bad faith may well proceed absent the regular, required orders. But the two presumptions are conceptually distinct, as regularity assumes that duties were performed, while good faith characterizes the manner in which these duties are presumed to have been performed.

In the Court of Claims, the presumption of good faith existed independent of the presumption of regularity—although, over the Court's first century, it was rarely invoked. Occasionally it was mentioned without attribution, in passing, *see, e.g., Davies v. United States,* 23 Ct.Cl. 468, 474, 1800 WL 1591 (1888) (stating that "in the absence of evidence to the contrary it must be presumed that [subpoenas] were issued in good faith" by a court commissioner seeking compensation), or in dictum, *see, e.g., Pollen v. United States,* 85 Ct.Cl. 673, 683 (1937) ("The presumption obtains that in the exercise of authority good faith will characterize the conduct of the Government officials in discharging their duties."). In a case concerning the discretion of the Postmaster General, the presumption as stated in *Slavens,* 196 U.S. at 236, 25 S.Ct. 229, was quoted and relied upon. *Miller v. United States,* 47 Ct.Cl. 146, 150, 1911 WL 1339 (1911). And several cases involving the property of Indian tribes quoted the Supreme Court's pronouncements of the presumed good faith of Congress, *see, e.g., Sioux Tribe v. United States,* 97 Ct.Cl. 613, 673, 1942 WL 4334

(1942); *Duwamish, Lummi, etc. Tribes v. United States,* 79 Ct.Cl. 530, 600, 1934 WL 2033 (1934). The strength of the presumption in these different contexts varied, from being deemed (at that time) conclusive in the Indian cases—as the court would not question the motives of Congress, *Sioux Tribe,* 97 Ct.Cl. at 668; to being rebutted by the mere silence of the court official when asked to explain his account entry, *Davies,* 23 Ct.Cl. at 474. But none of these disparate precedents appears to be the source of the presumption, as it is currently recognized.

Rather, the presumption of good faith as we know it appears to have its roots in two places. First, there is the Supreme Court's *Chemical Foundation* decision. *See Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959). But this decision, as is discussed above, really concerned the presumption of regularity and not good faith. The duty that was presumed to have been "properly discharged" was the duty to obtain "knowledge of the material facts." *Chemical Foundation,* 272 U.S. at 15, 47 S.Ct. 1. The Supreme Court expressly refused to question the exercise of the official's judgment, *see id.,* which is usually the nub of the matter when the good faith presumption is invoked. But this opinion is often reflexively cited without any explanation of its relevance.

The second, and more substantial, source of the presumption appears to be the pre-*Wunderlich* line of cases concerning the exercise of discretion given by contract to certain government officials.[34] The standard for reviewing discretionary employment decisions was borrowed from this line of cases, *see Gadsden v. United States,* 111 Ct.Cl. 487, 490, 78 F.Supp. 126 (1948) (adopting the rule from, inter alia, *Kihlberg v. United States,* 97 U.S. 398, 14 Ct.Cl. 582, 24 L.Ed. 1106 (1878); *United States v. Gleason,* 175 U.S. 588, 602, 35 Ct.Cl. 625, 20 S.Ct. 228, 44 L.Ed. 284 (1900); and *Ripley v. United States,* 223 U.S. 695, 701, 32 S.Ct. 352, 56 L.Ed. 614(1912)).

---

**34.** *See United States v. Wunderlich,* 342 U.S. 98, 100, 72 S.Ct. 154, 96 L.Ed. 113 (1951) (holding that, despite decades of precedents using broader language, only proof of fraud can overcome the discretionary decisions of contracting officials); *but see* Pub.L. No. 356, 83d Cong., 2d Sess., 68 Stat. 81, 41 U.S.C. § 321 (overturning *Wunderlich* by subjecting to review any such decision that is "fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence").

An employee discharge case following this line of precedents, *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630 (1954), stated without attribution that the Court "start[s] out with the presumption that the official acted in good faith," and that "well-nigh irrefragable proof" is needed to prove the absence of good faith. *Knotts*, 128 Ct.Cl. at 492, 121 F.Supp. 630. The subsequent development of the presumption of good faith springs from these two statements.

The presumption, as stated in *Knotts*, seems to come, then, from the pre-*Wunderlich* line of cases. Government contracts used to routinely contain clauses assigning the resolution of certain questions arising under them, usually of a factual nature, to a certain designated official—often the contracting officer or a supervising engineer, with an appeal to the department head. The Supreme Court had held that "in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment," the official's decision under such clauses would be "conclusive upon" both the contractor and the government. *Kihlberg v. United States*, 97 U.S. 398, 402 (1878). Thus, despite the discretionary and purportedly final nature of these decisions, the Court of Claims was able to exercise jurisdiction over challenges that met the *Kihlberg* standard, as that standard evolved over time. *See, e.g., United States v. Gleason*, 175 U.S. 588, 607 (1900) (re-stating test as requiring "allegation and proof of bad faith, or of mistake or negligence so great, so gross, as to justify an inference of bad faith"); *Ripley v. United States*, 223 U.S. 695, 701–02, 32 S.Ct. 352 (1912) (recognizing "a corresponding duty that the agent's judgment should be exercised—not capriciously or fraudulently, but reasonably and with due regard to the rights of both contracting parties").

Since the issue in these cases boiled down to whether a government official properly exercised his discretion, under a formal role assigned by consent of a contractor via contract, one would naturally assume that the presumption of good faith would figure prominently in them. This assumption turns out to be incorrect. In one case, the Supreme Court is quoted for its proposition, "[w]e are permitted, and indeed required, in the absence of evidence of bad faith on his part, to presume that [the government official] acted with due regard to his duties as between the Government and the contractors," *Gearing v. United States*, 48 Ct.Cl. 12, 22, 1912 WL 1165 (1912) (quoting *Gleason*, 175 U.S. at 607). In another case, in which a contractor challenged the Secretary of the Interior's decision to authorize the suspension of its contract, the basis was not "bad faith or fraud or mistake so gross as to justify an inference thereof," but that the Secretary relied on "inaccurate information" received from subordinates. *Pacific Coast Constr. Co. v. United States*, 53 Ct.Cl. 582, 589, 1918 WL 160 (1918). Since plaintiff failed to make the proper allegations concerning the Secretary, this argument was rejected, with the Court noting in passing that the Secretary "acted, presumably in good faith, on such evidence as was satisfactory to him." *Id.* at 589.[35] But it seems that the normal practice was either merely to state that bad faith is not presumed, see *Trumbull Steel Co. v. United States*, 76 Ct.Cl. 391, 402, 1 F.Supp. 762 (1932) (stating "[n]either bad faith nor fraud are ever presumed and there is nothing in the record to show ... bad faith"), or, more usually, to make no reference to presumptions at all. *See, e.g., Penner Installation Corp. v. United States*, 116 Ct.Cl. 550, 89 F.Supp. 545 (1950); *Globe Grain & Milling Co. v. United States*, 70 Ct.Cl. 595, 1930 WL 2436 (1930).

One might surmise that the presumption was unstated but understood, and look instead for a requirement that proof be "well-nigh irrefragable" in these cases. But the term "irrefragable" does not itself appear in any of the pre-*Wunderlich* cases, or, indeed, in any cases involving bad or good faith.[36]

---

**35.** *See also Needles v. United States*, 101 Ct.Cl. 535, 606 (1944) ("The fact that the decision was very erroneous likewise is not sufficient to justify its being overturned if the officer appears to have known or considered fairly the facts and circumstances, or if there is no proof that he did not do so it will be presumed that he did consider them.").

**36.** As was noted above, "irrefragable" proof was invoked by the Supreme Court as needed to

Nor is there any requirement of "clear and convincing" proof of an absence of good faith. To the contrary, "bad faith" is usually described as something that may be *implied* rather than directly established, as the Court of Claims required "proof of bad faith, or of mistake or negligence so great, so gross, as to justify an inference of bad faith." *Carstens Packing Co. v. United States,* 52 Ct.Cl. 430, 435, 1917 WL 1299 (1917) (citing *Gleason* and *Kihlberg*). The Court on occasion would state conclusions such as that "the facts clearly established by the greater weight of the credible evidence of record" favored the contractor. *Needles v. United States,* 101 Ct.Cl. 535, 593, 1944 WL 3698 (1944). In one opinion, the Court of Claims stated that a "judicial conclusion as to the establishment of bad faith must rest upon a substantial and convincing foundation," and that "personal animosity" would not be inferred "unless the proof adduced to sustain the charge is extremely clear and free from irreconcilable conflicts." *Ordnance Engrg. Corp. v. United States,* 68 Ct.Cl. 301, 335, 1929 WL 2454 (1929).

But the norm was to avoid any talk of a heightened standard of proof, and instead to focus on what needed to be proven. The Court of Claims explained:

When such a contention is made and the issue as to whether the finding or decision involved was or was not consistent with good faith, or that it should be found to have been arbitrary or so grossly erroneous as to imply bad faith, is present, no question of personal animosity or calculated bias, prejudice, or actual dishonesty is necessarily involved in an ultimate finding of bad faith.

*Needles,* 101 Ct.Cl. at 602. Under this approach, "[g]ood faith, impartiality, or gross error, and implied bad faith are all to be considered by the court in a legal sense." *Id.* at 603. Arbitrary actions would imply bad faith, and needed "proof sufficient to

show that if the contracting officer had properly and reasonably considered the facts and contract provisions he should and probably would have reached a different conclusion." *Id.* A contractor did not need "additional evidence of animus," nor was "personal bias or prejudice necessary to be proved in addition to proof of error so gross as to warrant the court in inferring the fact of bad faith, or the total absence of good faith." *Id.* at 604. The Court concluded: "Whether there was, when the administrative decision was made, such an absence of impartiality and good faith as to imply bad faith is a conclusion of fact arrived at by the use of an objective standard." *Id.* at 605.

It was the severity of an error or mistake, not the clear evidence of bad intentions, that was needed to prove implied bad faith. *See, e.g., Globe Grain,* 70 Ct.Cl. at 627 (discussing "a plain misconception of the facts," "[a] mistake which is plain and palpable," and "a mistake of fact or law which is so gross and palpable" as constituting bad faith). The absence of good faith was a broad concept in this line of cases, encompassing the arbitrary, capricious, or unreasonable. *See, e.g., Penner Installation Corp.,* 116 Ct.Cl. at 567 (finding decision "arbitrary and capricious, and lacking in that good faith required of an unbiased, impartial arbiter"); *Levering & Garrigues Co. v. United States,* 71 Ct.Cl. 739, 754, 1931 WL 2311 (1931) (finding action "so arbitrary and grossly erroneous as to constitute bad faith"); *Mundy v. United States,* 35 Ct.Cl. 265, 287, 1900 WL 1451 (1900) (describing "bad faith or the exercise of capricious and wanton power"); *Carstens Packing,* 52 Ct.Cl. at 434 (decision may be reviewed if "the contractor had been required to furnish a totally unreasonable amount, or unless bad faith was shown"); *Miller v. United States,* 53 Ct.Cl. 1, 1917 WL 1268 (1917) (finding engineer "acted with perfect good faith in this matter, and was neither arbitrary or unreasonable"); *Globe*

rebut the presumption that a *marriage* was entered into in good faith. *See Gaines,* 73 U.S. at 707 (quoting *Clendenning v. Clendenning,* 3 Mart. (N.S.) 438, 442, 1825 WL 1293 (La.1825)). The state court precedent relied upon is very specific that the "irrefragable proof" was due to the court considering "a question like this"—whether a woman had knowledge that the man she was marrying was already married. *Clendenning,* 3 Mart. at 442. The *Knotts* opinion did not cite *Gaines* and, moreover, it would hardly be an apt source for a general requirement of "irrefragable" proof.

*Grain,* 70 Ct.Cl. at 626 (explaining "officer is required to exercise the highest degree of care, good faith, and honest judgment, and must not act arbitrarily or capriciously").

Under Court of Claims precedents, good faith could be absent if a decision lacked "substantial evidence to support it." *Penner Installation Corp.,* 116 Ct.Cl. at 564; *see also, e.g., Kennedy v. United States,* 24 Ct.Cl. 122, 126, 1800 WL 1619 (1889) (reporter states that court found that official annulling contract apparently had not "acted in bad faith or fraudulently, or from a mistake of substantial facts of the condition and situation of the claimant and work at the time"). A decision that was made with "great" or "gross" negligence could constitute bad faith. *See Carstens Packing,* 52 Ct.Cl. at 435; *Morris & Cumings Dredging Co. v. United States,* 78 Ct.Cl. 343, 350, 1933 WL 1793 (1933); *Crowley v. United States,* 105 Ct.Cl. 97, 114, 62 F.Supp. 887 (1945) (recognizing that a "clearly erroneous" interpretation of a contract by an inexperienced engineer could "imply legal bad faith" even if "not intentional"). And, most significantly, when an engineer was not merely approving or denying requests made by a contractor, but "actively direct[ed] work to be done in a certain manner which prove[d] defective and cause[d] great loss to the contractor," the government was liable when the defects were of a type "which the exercise of ordinary care and skill should have foreseen." *Moore v. United States,* 46 Ct.Cl. 139, 172–74, 1910 WL 921 (1910).

It can be seen, then, that the line of cases that *Knotts* relied upon contained no general requirement of a heightened standard of proof, and almost never mentioned any presumption of good faith. The Court of Claims knew how to state a higher standard in these opinions when it wanted to, see, for instance, *DuBois Constr. Corp. v. United States,* 120 Ct.Cl. 139, 175, 98 F.Supp. 590 (1951) (holding that the government's counterclaim alleging fraud by the contracting officer "must be substantiated by clear and convincing proof which must rebut every presumption of hon-

esty and fair dealing") (internal quotation marks and citations omitted). But the Court's claim that it takes "well-nigh irrefragable proof," *Knotts,* 128 Ct.Cl. at 492, was without support in the *Knotts* opinion and in the Court's precedents. *See, e.g., Elchibegoff v. United States,* 123 Ct.Cl. 709, 711, 1952 WL 5956 (1952) (in employee discharge case, finding "the absence of substantial evidence that the action of the officials was arbitrary or capricious or that it was exercised in bad faith").

Five years after *Knotts,* in *Librach v. United States,* 147 Ct.Cl. 605 (1959), the Court of Claims adopted an unopposed report of a trial commissioner in a breach of contract matter. One of the arguments in *Librach* was that the government's exercise of power under a termination for convenience clause was done in "bad faith," so that the contract could be given to another contractor. 147 Ct.Cl. at 612. The Court found "the record is devoid of any evidence supporting this allegation," and stated that:

> in the absence of clear evidence to the contrary, it must be presumed that the public officials involved in the termination of the plaintiffs' contract were acting conscientiously in the discharge of their duties when the contract was terminated for the purported convenience of the Government.

*Id.* The Court cited two presumption of regularity cases, *Chemical Foundation* and *New River Mineral Co. v. Roanoke Coal & Coke Co.,* 110 F. 343, 345 (4th Cir.1901), and the *Knotts* opinion in support of this proposition. *See Librach,* 147 Ct.Cl. at 612. Curiously, no citation is made to the tests for the absence of good faith developed in the pre-*Wunderlich* line of cases, despite their obvious relevance.[37] The Court found "no evidence in the record" supporting a motivation of "bad faith or caprice" and that evidence showed the officials "were not actuated by animus." *Id.* at 613–14. The Court, however, did not hold that clear and convincing evidence of bad faith was required, in contrast to its treatment of the issue of whether a profit allowance clause of the contract was "the

---

**37.** This can hardly be explained by the narrowing of the test to fraud, for purposes of determining jurisdiction, by the *Wunderlich* Court, as the

subsequent *Knotts* opinion retained the "arbitrarily, or capriciously" portion of the formulation. *See Knotts,* 128 Ct.Cl. at 492.

result of a mutual mistake, or as the result of misrepresentation, deceit, fraud, or duress," which required "clear and convincing proof." *Id.* at 614.

*Librach* subtly changed the *Chemical Foundation* formulation from the presumption that in performing official acts public officials "have properly discharged their official duties," *Chemical Foundation*, 272 U.S. at 15, 47 S.Ct. 1, to the presumption that public officials "were acting *conscientiously* in the discharge of their duties." *Librach*, 147 Ct.Cl. at 612 (emphasis added). This emphasis on the intent of the actor effectively converted the presumption of regularity to one of good faith, and introduced the "clear evidence" language into Court of Claims jurisprudence—although, as we have seen, the use of the modifier "clear" appeared to have been adopted by the Supreme Court through inadvertence and without appreciation of any significance.

Subsequent opinions of the Court of Claims demonstrated that it, too, did not necessarily believe that any elevated standard of proof was needed to rebut the presumption. Some opinions very clearly stated that a "preponderance of the evidence" standard applied in determining whether government actions were arbitrary, capricious, or in bad faith. *See Harrington v. United States,* 161 Ct.Cl. 432, 441–42, 1963 WL 8541 (1963); *Morelli v. United States,* 177 Ct.Cl. 848, 858, 1966 WL 8901 (1966). A later opinion recognized that it was an open question whether "cogent and clearly convincing evidence" or "the less stringent preponderance of the evidence test" applied in the context of military personnel decisions, which are given great deference under a "strong presumption." *Brooks v. United States,* 213 Ct.Cl. 115, 121, 1977 WL 5206 (1977). And while "well-nigh irrefragable proof" was often stated as the standard, it could still be met by showing a lack of evidence to support an official's decision. *See, e.g., Kozak v. United States,* 198 Ct.Cl. 31, 35–37, 458 F.2d 39 (1972); *Crocker v. United States,* 130 Ct.Cl. 567, 574–75, 127 F.Supp. 568 (1955); *cf. Marcus v. United States,* 200 Ct.Cl. 544, 552, 473 F.2d 896 (1973) (stating presumption maybe overcome if "it affirmatively appeared that the reason

was something improper, or the action was taken without reason").

This area of jurisprudence has persisted in its elusiveness. In the 1976 opinion in *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298 (1976), the Court of Claims stated that when a contract clause converts a breach into a termination for convenience, the presumption of good faith dealing applies to any challenged government action, and a "high standard of proof [is] required to show bad faith (tantamount to a showing of malice or conspiracy)." *Id.* at 199. This is an unusual point, in that the "good faith" that is presumed when officials take deliberate actions under their discretionary power would seem to have little to do with acts that are deemed constructive terminations for convenience. The Court in the opinion even highlights this anomaly: "Mere error on the part of the Government, *even if it would constitute sufficient ground for contractual breach were the termination clause inapplicable,* is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience." *Id.* at 201 (emphasis added). On the other hand, the Federal Circuit in a 1993 opinion stated that "irrefragable proof" was needed to overcome the presumption, but then opined that "some evidence inconsistent with the presumption" is sufficient to rebut the presumption and shift "the ultimate burden of persuasion" to the other side. *Alaska Airlines,* 8 F.3d at 795, 796.

Some clarity was finally brought to this area in 2002, in the Federal Circuit's decision in *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234 (Fed.Cir.2002). In *Am–Pro,* a contractor alleged that a release of claims was signed under duress. The Federal Circuit applied the presumption of good faith, and determined it was a "strong presumption" when "it arises in the context of quasi-criminal wrongdoing by government officials acting in the course of their public duties." *Id.* at 1239. The Circuit held that the "well-nigh irrefragable" or "clear evidence to the contrary" standard meant "clear and convincing proof" when the presumption is invoked "in the situation where a government official allegedly engaged in fraud or in

some other quasi-criminal wrongdoing." *Id.* The Circuit cited a Supreme Court discussion of the different burdens of proof, which explained that clear and convincing proof is employed in "civil cases involving allegations of fraud or some other quasi-criminal wrongdoing" in order to "reduce the risk to the defendant of having his reputation tarnished erroneously." *Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see Am–Pro,* 281 F.3d at 1239 (citing *Addington* ); *cf. Pauley Petroleum,* 219 Ct. Cl. at 52 (stating clear and convincing evidence is needed to prove "government deceit").

■ The Court concludes, following *Am–Pro,* that when a government official is accused of fraud or quasi-criminal wrongdoing in the exercise of his official duties, there is a strong presumption of good faith conduct that must be rebutted by clear and convincing evidence. But in light of the other precedents discussed above, this Court is unwilling to extend this strong presumption beyond the bound set by the Federal Circuit in *Am–Pro,* to settings where the rationale does not apply. When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. And when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application. *See Moore,* 46 Ct.Cl. at 172–74 (government liable for work negligently ordered and directed by engineer). When it is not a discrete decision by one official, but a number of acts that are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad faith. *See Struck Constr. Co. v. United States,* 96 Ct.Cl. 186,

221, 1942 WL 4411 (1942) ("If the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard."); *cf. Needles,* 101 Ct.Cl. at 602–07 (discussing objective standard for implied bad faith that does not require proof of malice, bias or animus).

■ Concerning the presumption of regularity, the Court concludes that it will usually mean only that predicate acts that were required of public officials could be presumed upon proof of their natural results, subject to rebuttal by a preponderance of the evidence. The presumption only takes on a greater significance in the context of administrative record reviews, such as bid protest matters, where it may foreclose discovery absent "evidence suggesting that the agency decision is arbitrary and capricious." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1338 (Fed.Cir.2001); *see also Orion Int'l Technologies v. United States,* 60 Fed.Cl. 338, 344 (2004); *Beta Analytics Int'l, Inc. v. United States,* 61 Fed.Cl. 223, 226 (2004).

### b. What constitutes breach of the implied duties?

■ The question to be considered, then, is whether a breach of any of the implied duties identified by Tecom requires proof of conduct that amounts to fraud or "quasi-criminal wrongdoing," *Am–Pro,* 281 F.3d at 1239. The Court notes at the outset that, while "[t]he implied duties to cooperate and not to hinder are two separate, albeit related, implied duties," *Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. 35, 59 n. 31 (2001) (citing *Walter Dawgie Ski Corp. v. United States,* 30 Fed.Cl. 115, 130 (1993)), they appear to be "disparate aspects" of the overarching duty of good faith and fair dealing.[38] *Walter Dawgie,* 30 Fed.Cl. at 130; *see also Essex Electro Engineers, Inc. v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000) ("Every contract, as an aspect of the duty of good

---

[38]. The two duties may well be two different ways of expressing the same obligation. *See, e.g., C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed.Cir.1993) (referring to "the duty

to cooperate and not hinder the contractor's performance"); *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 95, 69 F.Supp. 409 (1947) (quoting Williston on Contracts).

faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks and citations omitted).

The Restatement (Second) of Contracts has found that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). Although this duty is stated in terms of "good faith," proof of bad intent does not appear to be required in order for a breach to be found. As the Restatement explains:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor *believes his conduct to be justified.* But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may *require more than honesty.* A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: ... lack of diligence and slacking off ... and interference with or failure to cooperate in the other party's performance.

*Id.* comment d (emphasis added).

Indeed, it is clear, particularly when the specific aspects of the duties to cooperate and not to hinder are at issue, that proof of fraud, or quasi-criminal wrongdoing, or even bad intent are not required. Breaches of the implied duty to cooperate have been found when a contracting officer responded to a contractor's requests in an evasive or untimely manner, *see Malone v. United States,* 849 F.2d 1441, 1445–46 (Fed.Cir.1988); *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20, 78 (2000) (discussing cases in which the Government "failed to timely respond to a contractor's request for information" or "fail[ed] to provide assistance at the request of a contractor") (citations omitted); and when liquidated damages were erroneously imposed on a contractor, which "substantially impeded [the contractor's] ability to perform during a critical catch-up period," *Abcon Associates, Inc. v. United States,* 49 Fed.Cl. 678, 689 (2001). Breach of the duty to cooperate is assessed under a reasonableness standard, and depends upon "the particular contract, its context, and its surrounding circumstances." *Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81 (1964).

Similarly, under the implied duty not to hinder performance, Government actions that are unreasonable under the circumstances constitute a breach. *See C. Sanchez & Son,* 6 F.3d at 1542; *see also Essex Electro,* 224 F.3d at 1291 (holding that breach will depend on whether "government acted reasonably in the substance and pace of its responses"); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 741, 572 F.2d 786 (1978) (stating that "[t]he crucial factual determinations to be reached ... are whether the actions of the [Government] ... [were] unreasonable and unjustified under the circumstances in which they were taken."). This duty has been expressed as the obligation "not to willfully *or negligently* interfere with the contractor in the performance of his contract." *Peter Kiewit Sons' Co. v. United States,* 138 Ct.Cl. 668, 674, 151 F.Supp. 726 (1957) (emphasis added); *see also Chalender v. United States,* 127 Ct.Cl. 557, 563, 119 F.Supp. 186 (1954) ("When the contractor is delayed by a negligent act chargeable to the Government, it is a breach of this clearly implied obligation."). The duty has been found breached in such circumstances as when the Government negligently made errors in placing stakes and failed to make "adequate advance planning" on a project, *Lewis–Nicholson, Inc. v. United States,* 213 Ct.Cl. 192, 199–201, 550 F.2d 26 (1977); overzealously inspected work, *WRB Corp. v. United States,* 183 Ct.Cl. 409, 509, 1968 WL 9146 (1968); made untimely changes to contract specifications, *see, e.g., F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 507–08, 130 F.Supp. 394 (1955); and when "delay occurs because of excessive supervision or control over the contractor," *SIPCO Servs. & Marine Inc. v. United States,* 41 Fed.Cl. 196, 217 (1998) (citations omitted).

Nothing approaching fraud or quasi-criminal wrongdoing was involved in the cases cited above. Nor did the presumption of good faith appear to have played a part in any of these cases save one (*Sun Oil*), and

the acts at issue in that case were the approval of applications for permits—very formal, official acts that could not be taken by a private party to a contract. *See Sun Oil,* 215 Ct.Cl. at 746–48.[39] Since these specific aspects of the implied covenant of good faith and fair dealing do not require any proof of bad faith, and thus are not subject to the presumption of good faith, it follows that the same must be true of the general, overarching duty of which they are a part. And the strong presumption, under *Am–Pro,* that obtains when questions of fraud or quasi-criminal wrongdoing are alleged, has no place in the analysis. *Cf. Market Street Assocs. Ltd. Ptshp. v. Frey,* 941 F.2d 588, 594–95 (7th Cir.1991) (stating that "conduct that might not rise to the level of fraud may nonetheless violate the duty of good faith in dealing with one's contractual partners"). Indeed, very recently, the Federal Circuit has held that tax legislation passed by Congress breached the covenant of good faith and fair dealing. *Centex Corp. v. United States,* 395 F.3d 1283, 1311 (Fed.Cir.2005). The Court found that the implied covenant embraced the duty "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract," *id.* at 1304, and did not discuss at all "bad faith" or the presumption of good faith—even though a legislative act was at issue.

■ The Court concludes that claims of a breach of the implied covenant of good faith and fair dealing—including claims that the duties to cooperate and not hinder performance of a contract have been breached—are to be treated like any other claim for breach of contract. The presumption of good faith

conduct of government officials has no relevance. Were it otherwise, and were the presumption considered particular to government officials, it would no longer be the case that "[t]he duty applies to the government just as it does to private parties," *Centex Corp.,* 395 F.3d at 1304. This would be a rejection of the long-held notion that "the principles which govern inquiries as to the conduct of individuals, in respect to their contracts, are equally applicable where the United States are a party." *United States v. Smith,* 94 U.S. 214, 217, 12 Ct.Cl. 119, 24 L.Ed. 115 (1877).

Moreover, if the presumption of good faith conduct applied to breaches of the implied duties, it could also be invoked in all breach of contract actions, were the Government merely to add a standard contract clause promising in good faith not to breach the contract.[40] But since fraud or quasi-criminal wrongdoing are not at issue when a breach of the implied covenant of good faith and fair dealing is raised, and the actions complained of are typically not official public duties but instead the actions of a party in the performance of a contract, the presumption of good faith conduct poses no special obstacle to parties alleging such a breach. *See Abcon Assocs.,* 49 Fed.Cl. at 688 (holding that "a showing of bad faith is not required" to prove a breach of "the implied duties of good faith, fair dealing, and cooperation").[41] Whether or not the actions of the Air Force employees in this matter, taken in the aggregate, *see Struck Constr. Co.,* 96 Ct.Cl. at 221, breach the implied covenant of good faith and fair dealing simply does not threaten any individual with having his "reputation tarnished er-

---

**39.** Moreover, no heightened standard of proof was required to rebut the presumption. *See Sun Oil,* 215 Ct.Cl. at 746–48.

**40.** Perhaps this would not be problematic were the views of Holmes the professor to become the law in this area, eliminating notions such as "good faith." *See, e.g.,* Oliver Wendell Holmes, Jr., *The Path of the Law,* 10 Harv. L. Rev. 457, 462 (1897) ("The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else."); Oliver Wendell Holmes, Jr., the Common Law 301 (Boston 1990) ("The only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the

promised event does not come to pass. In every case it leaves him free from interference until the time for fulfilment has gone by, and therefore free to break his contract if he chooses.").

**41.** The *Abcon Associates* opinion pre-dates the Federal Circuit's decision in *Am–Pro,* and the Court is aware that some opinions of our Court have adopted the clear and convincing evidence standard in the context of alleged breaches of the implied covenant of good faith and fair dealing. *See, e.g., Boston Edison Co. v. United States,* 64 Fed.Cl. 167, 186 (2005); *J. Cooper & Assocs., Inc. v. United States,* 53 Fed.Cl. 8, 23 (2002). For the reasons stated in the text, the Court respectfully disagrees with those conclusions.

roneously," *Addington,* 441 U.S. at 424, 99 S.Ct. 1804. It is not the type of action, like a civil charge of fraud, that requires the safeguard of clear and convincing evidence.

### c. Are there disputed material facts?

Having concluded that the clear and convincing proof standard that accompanies the strong presumption of good faith is not a part of the calculus, the Court turns to the specific allegations of breach of the implied duties to cooperate and not to hinder. As each party has moved for summary judgment on the third and fourth causes of action, it bears repeating that we must "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors,* 812 F.2d at 1391.

At the outset, the Court notes that, no matter the metaphysical distinctions one might draw between a duty to cooperate and a duty not to hinder, as a practical matter these amount to the same thing. The case law does not appear to separate into clear categories, such that one could say, for instance, that failure to act implicates the former, and affirmatively acting the latter. *See, e.g., Abcon Assocs.,* 49 Fed.Cl. at 689 (erroneous imposition of liquidated damages held to breach duty to cooperate); *Law v. United States,* 195 Ct.Cl. 370, 395, 1971 WL 17828 (1971) (holding Government's failure to install equipment in a timely manner breaches duty not to hinder). Thus, the Court will look to whether material facts not in dispute prove that the Air Force was unreasonable in the actions undertaken (or neglected) in performance of the Contract, with the effect of hindering or delaying Tecom's performance; or whether, on the other hand, there is demonstrated a lack of sufficient facts identified that could prove such a breach.

The record rather clearly shows that Tecom has identified evidence that, drawing reasonable inferences in its favor, could prove unreasonable action by Air Force employees in violation of the implied duties, defeating the Government's claim of right to summary judgment on these causes of action. This includes the Air Force's failure to require that the outgoing contractor enter into the OLVIMS database all of the required repairs identified during the joint inspections, Pl.'s Ex. 10 at 44; Pl.'s Ex. 20; Pl.'s Ex. 21 (Albaugh depo. tr. pp. 180–83); the order that Tecom stop its inspection of the vehicle fleet and delete the L-coded items from OLVIMS, Pl.'s Ex. 22; the issuance of CDRs to Tecom for failing to meet the VOC and MEL standards, due to the inherited condition of the fleet, *see, e.g.,* Def.'s App. at 561; and the order that Tecom shut down its own database containing records of the repairs required at contract turn-over, Pl.'s Ex. 2 at 5, ¶ 12.b; Pl.'s Ex. 50.

Additional facts consistent with this conclusion are: the imposition of an inspection regime in which every vehicle maintained by Fleetpro was inspected, checking for more categories of deficiencies than previously done, Pl.'s Ex. 38 (Dodson depo. tr. p. 116); Pl.'s Ex. 60 (Albaugh depo. tr. pp. 91–92); the statements by Air Force employees that they might "kill" Fleetpro with CDRs, or issue CDRs because of Fleetpro's requests for reimbursement for backlog maintenance, Pl.'s Ex. 61 (Gilchrist depo. tr. pp. 117, 180); Pl.'s Ex. 32; and the Contracting Officer's refusal to inform Tecom, despite repeated requests, that he had already decided that the Air Force did not have to reimburse Tecom for reducing the backlog maintenance that had not been entered into OLVIMS by contract turn-over. Pl.'s Exs. 22, 33–35; Pl.'s Ex. 6 (Ozburn depo. tr. pp. 170–71); Def.'s Resp. Pl.'s Proposed Findings ¶¶ 111–14.

This evidence supports the claim that the Air Force did not reasonably cooperate with Tecom, and unreasonably hindered the latter's performance of the contract. The Air Force's actions made it harder for Tecom to determine the full scope of the deficiencies existing in the vehicle fleet at the start of the Contract. They may have required that vehicles be unnecessarily inspected more than once because of the deletion of inspection records. They may have resulted in delays to repair work that exacerbated the deficient conditions of some vehicles, increasing the associated maintenance costs. The Air Force might have over-inspected Fleetpro's

work, and issued CDRs for problems that it knew were inherited. And it might have kept Tecom in the dark about its decision not to reimburse the contractor for reduction of the maintenance backlog, while the contractor was incurring additional expenses to reduce this backlog. These facts might well demonstrate bad faith, and an actual intent to injure the contractor—perhaps even irrefragably.

While the Court finds it a close call, there appear to be just enough reasonable inferences that can be drawn in·the Air Force's favor to allow it to survive Tecom's motion for summary judgment on these claims. As the Government points out, under the Transportation PWS it had the right to inspect every vehicle that Fleetpro serviced. *See* Pl.'s Ex. 5 at 10 (§ 1.4), 65 (TE–1–1, § 2.2); 48 C.F.R. § 52.246–4(c) (1996) ("The Government has the right to inspect and test all services called for by the Contract, to the extent practicable at all times and places during the term of the contract."). The exercise of deciding, via summary judgment, questions such as the reasonableness of conduct, is inherently difficult due to the matter of context. Tecom would infer that the more rigorous inspection regime was an effort to punish or force out the subcontractor. But the Air Force could have been reacting to the fact that a large maintenance backlog had developed under the prior contract, and attempting to prevent this from reoccurring. *See, e.g.,* Pl.'s Ex. 19 at G100040 (CDR issued to LB & B noting "quality control program is substandard"); Pl.'s Ex. 31 (Karzon memo. noting that assessment of vehicles "called into question the completeness of operator inspections"). Similarly, the Air Force may have ordered that Tecom stop inspecting vehicles prior to the scheduled service dates because it believed that resources would be better utilized to reduce the backlog rather than to document it.

The deletion of L-coded items from the OLVIMS database could have been intended to benefit Tecom, by allowing it to meet VOC rates. *See* Pl.'s Ex. 35 (Letter from Tecom's Senior Vice President listing the L-code deletions as part of a "plan to meet the current and future in commission rate require-

ments"); Pl.'s Ex. 22 (Ozburn memo. stating the Air Force "has agreed to look at all 'L' coded workorders to determine what work can be waived/deleted"); Pl.'s Ex. 2 at 5 (¶ 12.a); Pl.'s Ex. 34. The Fleetpro computer system might have been shut down for security reasons. *See* Pl.'s Ex. 50 (Karzon memo. stating the system would be "shut down until the system has been accredited and a DD Form 254 approved for the connection"); Pl.'s Ex. 2 at 5 (¶ 12.b). Even the note from the Air Force meeting that indicates that it was "going to have to start taking deductions from" Tecom if the latter "ask[ed] for money for backlog," Pl.'s Ex. 32; Def.'s Resp. Pl.'s Proposed Findings ¶ 110, might be less than nefarious if, as the Air Force contends, the CDRs were all legitimate. *See* Def.'s App. 255–627 (containing nineteen CDRs).

The Court does not intend to imply that these inferences are the most likely or plausible ones to be drawn from the evidence. But they are sufficient to demonstrate the existence of disputed material facts concerning Tecom's third and fourth causes of action, precluding judgment at this time. Accordingly, both Tecom's motion, and the Government's cross-motion, for summary judgment on the implied duty claims are DENIED.

*3. Damages Based on the Air Force Audit Results*

█ Tecom has moved for partial summary judgment on damages, arguing that much of its breach of contract damages have been verified by an audit conducted by the Defense Contract Audit Agency ("DCAA"). Pl.'s Mem. at 25–26, 34; Pl.'s Reply at 20 n. 41. After Tecom had submitted a claim for an equitable adjustment pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13, *see* Pl.'s Ex. 46, the Air Force requested that the DCAA perform an audit of the $ 724,504 claimed—which consisted of $ 617,-480 in costs for Fleetpro and $ 107,024 in costs for Tecom. Pl.'s Ex. 47. Among other things, the DCAA was asked "to provide a comprehensive analysis of proposed costs expended for 'changed' and 'added' work to the subject contract" and an "assessment of the claimant's methodology for developing the

claimed quantum (price adjustment)." *Id.* It was also asked to "[v]erify Fleetpro's recorded actual expenditures" and was told that "[s]pecial attention should be given to evaluating Fleetpro's 'estimated' over and above expenditures and any corroborating or refuting data available from Fleetpro's payroll and other accounting records." *Id.*

The auditor ultimately determined that the claim was *understated* by some $27,744. *See* Pl.'s Ex. 49; Pl.'s Ex. 48 (Samios–Uy depo. tr. pp. 44, 87). The Contracting Officer had agreed that one purpose of the audit was "to determine whether [Tecom and Fleetpro] were using proper or improper measures for evaluating their damages," Pl.'s Ex. 6 (Ozburn depo. tr. p. 145); Def.'s Resp. Pl.'s Proposed Findings ¶ 139. The audit report stated that "[t]he purpose of our audit was to determine if the claimed costs are acceptable as a basis for adjudication of a settlement." Pl.'s Ex. 49 at 1. Based on these statements, and the audit results, Tecom argues that its damages for breach of contract have been established to be at least the amount found by the DCAA.[42]

As the Government emphasizes in its opposition, *see* Def.'s Opp. at 28, Tecom provides no legal authority for its claim that the DCAA audit somehow proves or concedes an amount of damages. Nor is the Court aware of any authority that supports this proposition. The auditor did not determine that Tecom's expenses were the result of the Air Force's breach, or were incurred to reduce an inherited maintenance backlog. *See* Pl.'s Ex. 48 (Samios–Uy depo. tr. p. 32) (auditor states he is "not qualified to really determine whether this task is over and above"). He merely verified the figures, based on Fleetpro's books. While this audit will certainly bear on the credibility of any attempt by the Government, at trial, to question the accuracy of the figures contained in Tecom's claim, it does not concede or establish that these costs were definitively the result of the Air

Force's breach. Tecom's motion as to damages is DENIED.

## B. The Government's Cross–Motion for Summary Judgment

In addition to its cross-motion for summary judgment on Tecom's second, third, and fourth causes of action, which were discussed above, the Government moves for summary judgment on Tecom's two remaining claims.

### 1. Count I—Equitable Adjustment for Constructive Change to Contract

Tecom maintains that it is entitled to an equitable adjustment, because the vehicle fleet was in much worse condition than the Contract indicated. *See* Complaint ¶¶ 36–37. It initially described the additional work it had to perform as "a complete *restoration* (or 'overhaul'), a maintenance function normally reserved for 'depot level' repair contracts." *Id.* ¶ 36. The Government points out that "depot maintenance" is specifically defined in the Contract, Def.'s Opp. at 32–33 (citing PWS § 2.2.16; *see* Pl.'s Ex. 5 at 17), and that there is no evidence that such an overhaul was ordered for any of the fleet's vehicles. *See* Def.'s App. at 663–64 (Fleetpro's project manager states "[w]e never did depot level maintenance"). Tecom now concedes that this was a mere rhetorical flourish to describe the fleet's "woeful condition," and maintains that the gravamen of its claim is that this poor condition violated the warranty of suitability covering Government-furnished property. *See* Pl.'s Reply at 28 n. 58.

For a contract to be constructively changed, the plaintiff must demonstrate that the Government expressly or impliedly ordered the contractor to perform work that was outside the contract requirements. *Al Johnson Constr. Co. v. United States,* 20 Cl.Ct. 184, 204, 1990 WL 49678 (1990); *Lathan Co., Inc. v. United States,* 20 Cl.Ct. 122,

---

42. Tecom claims the amount to be $ 916,573, exclusive of interest, based on its amended claim filed November 17, 1998. Pl.'s Ex. 51. The record does not indicate whether the data supporting this amended claim was reviewed by the DCAA, which completed its report on December 1, 1998. The audit report states that Fleetpro's portion of the claim was $669,894, which differs from the number provided in the Air Force's request. *Compare* Pl.'s Ex. 49 *with* Pl.'s Ex. 47. Whether this reflects the amended claim amount, or a typographical error on the part of the Air Force, cannot be determined based on the current record.

128 (1990); *Calfon Constr. Inc. v. United States,* 18 Cl.Ct. 426, 434 (1989); *see Len Co. & Assocs. v. United States,* 181 Ct.Cl. 29, 39, 385 F.2d 438 (1967). The Government's order, however, need not be formal or in writing. *Wm. A. Smith Contracting Co. v. United States,* 188 Ct.Cl. 1062, 1089, 412 F.2d 1325 (1969); *Len Co.,* 181 Ct.Cl. at 39, 385 F.2d 438.

▮ "To receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965). The plaintiff must prove each of these elements by a preponderance of the evidence. *Perry v. Dept. of the Army,* 992 F.2d 1575, 1578 (Fed.Cir.1993). "Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change." *Aydin Corp. (West) v. Widnall,* 61 F.3d 1571, 1577 (Fed.Cir.1995). Therefore, the Government breaches its contract if it fails to grant the contractor an equitable adjustment when the contract is constructively changed. *See id.*

▮ The thrust of Tecom's claim of a constructive change is as follows: The vehicle fleet was Government-furnished property, *see* Pl.'s Ex. 5 at 24, PWS ¶ 3.3. The Contract provides that if a contractor is directed to repair GFP received "in a condition not suitable for the intended use," the Government will pay for this through an equitable adjustment. *See* Pl.'s Ex. 1 at 35; 48 C.F.R. § 52.245–2(a)(3) (1996). Therefore, since the fleet at contract turn-over required thousands of hours of backlog maintenance, Pl.'s Ex. 19, and the VOC rate was an excessive 39.6%, Pl.'s Ex. 10 at 53, the work it had to do to restore the fleet to standards constituted work outside the contract requirements.

The Court questions whether the warranty of suitability is at all relevant to a maintenance contract like the one at bar, other than as it would relate to the equipment used to repair the vehicles and the like. Tecom was not, except in limited instances, *see* Pl.'s Ex. 5 at 29–30, PWS ¶¶ 5.1.4.1–5.1.5.1 (contrac-

tor-provided bus, taxi, and cargo service), the *user* of the vehicles. The Contract, however, does provide that Tecom was to "maintain the vehicle fleet ... to ensure MELs of TE 9 and VOC rates established in TE 1 are met." Pl.'s Ex. 5 at 37, PWS ¶ 5.2.2.1. To be able to *maintain* a fleet at the levels and rates required presupposes that the fleet meets those standards to begin with, so Tecom appears to have a valid claim, supported by evidence. This is not a question of a contractor under a fixed-price contract having underestimated its expenses for a given quantity of work; rather, the quantity of work was more than the Government represented. It is likely the case, though, that this claim will turn out to be functionally one in the alternative, and that any expenses incurred in bringing the fleet up to standards will be fully compensated under the breach of contract claim. But the undisputed evidence of the VOC rates being exceeded at contract turn-over support a claim for an equitable adjustment under Tecom's contract for vehicle maintenance, and accordingly the Government's motion for summary judgment on the first cause of action is DENIED.

### 2. Count V—Wrongful Termination

Tecom argues that "[t]he Air Force improperly pressured [it] to terminate Fleetpro's Contract." Complaint ¶ 47. It is undisputed that Air Force personnel on several occasions told Tecom that Fleetpro should be terminated, and threatened to issue a cure notice, to terminate the contract for default, or not to renew the contract if Fleetpro were not removed as subcontractor. Def.'s Resp. Pl.'s Proposed Findings ¶¶ 129–31, 133. Before any action was taken by the Government, however, Tecom chose to terminate Fleetpro on its own. *See* Pl.'s Ex. 45. The termination letter, in fact, stated that Tecom believed it was "quite clear from the attached correspondence that our contract is *about to be* terminated because of perceived or actual FleetPro performance." *Id.* (emphasis added).

The Government, for its part, contends that its dissatisfaction with Fleetpro's performance was well-documented and justified, citing among other things the issuance of the

nineteen CDRs and complaints from Generals concerning the quality of maintenance work. Def.'s Opp. at 36–37; *see* Def.'s App. at 255–627; Pl.'s Ex. 43. The Contracting Officer had noted that the Air Force had "three organizations who either refuse to bring in their vehicles because repair is so untimely that it is impacting their mission, or who are looking at other alternatives for vehicle support (e.g. GSA vehicles)." Pl.'s Ex. 43. And although it had not yet exercised it, the Government did have the right to terminate the Contract for default. *See* Pl.'s Ex. 1 at 35; 48 C.F.R. § 52.249–8.

■ A contractor is responsible for the performance failures of its subcontractors absent a showing of impossibility or other excusable grounds. *Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1252–1253 (Fed.Cir.2002); *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 207, 602 F.2d 950 (1979). "When the government has reasonable grounds to believe that the contractor may not be able to perform the contract on a timely basis, the government may issue a cure notice as a precursor to a possible termination of the contract for default." *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337 (Fed.Cir.2000); *see* 48 C.F.R. §§ 49.102, 49.402–3 (2005). In response to a cure notice, the contractor must provide assurances to the Government "that progress is being made toward a timely completion of the contract, or to explain that the reasons for any prospective delay in completion of the contract are not the responsibility of the contractor." *Danzig*, 224 F.3d at 1337. If the contractor fails to provide these assurances to the Government, the Government may terminate the contract for anticipatory breach. *Id.; see* RESTATEMENT (SECOND) OF CONTRACTS § 251 (1981).

■ If Tecom were correct in assuming that formal action to terminate its Contract was impending, it could have provided assurances to the Air Force in response to the requisite cure notice. If these assurances were not to the Air Force's satisfaction, and a termination resulted, this, of course, could have been the subject of a legal challenge. Instead, Tecom is essentially arguing a wrongful constructive termination of its sub-

contractor, but provides no authority for such an action. It cites *Liles Constr. Co. v. United States*, 197 Ct.Cl. 164, 455 F.2d 527 (1972), for the proposition that "[p]ressure to terminate a subcontractor arising from ill-will is actionable." Pl.'s Reply at 29; *see also id.* at 30. But that case involved an actual *order* that the subcontractor be replaced, *Liles Constr.*, 197 Ct.Cl. at 169, 455 F.2d 527, and at best merely demonstrates that Tecom's allegations are relevant to its equitable adjustment claim, and possibly its claim of breach of the duty not to hinder performance. *See id.* at 173–76. The Air Force did not order the termination of Fleetpro, as much as it desired that result. The Government's motion for summary judgment on the fifth cause of action is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment as to liability on its second cause of action, for breach of contract, is hereby **GRANTED**. The Government's motion for summary judgment on the fifth cause of action is **GRANTED**. Plaintiff's motion for summary judgment on its third and fourth causes of action, and the Government's motion for summary judgment on the first, second, third, and fourth causes of action, are **DENIED**, as is plaintiff's motion for partial summary judgment on damages.

**IT IS SO ORDERED.**